UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------x

JAMES LYNCH, LLOYD JONES,
and BARON SPENCER,
on Behalf of Themselves and Others
Similarly Situated,

                             Plaintiffs,                    **CLASS ACTION
COMPLAINT AND
JURY DEMAND**

       - against -

CITY OF NEW YORK,

                             Defendant.
-----------------------------------------------------------------x

Plaintiffs James Lynch, Lloyd Jones, and Baron Spencer ("Plaintiffs"), on behalf of themselves and others similarly situated (collectively, the "Class"), for their Complaint, allege as follows:

## PRELIMINARY STATEMENT

1.      The bail payment and release process in New York City is an object lesson in deliberate indifference to constitutional rights.

2.      For years, advocates and experts repeatedly told the City that the process for paying bail in New York City was hopelessly broken. A 2015 report called the system "confusing and perplexing," noted that it causes unnecessary delays and overdetentions, and offered a slew of recommendations for improvement—which the City ignored. An exhaustive 2015 exposé about the "deranged" bail payment system in New York City called it a "tragically dark comedy" and detailed the "disastrous impact" it has on arrestees and their families. The

City Councilman charged with overseeing the justice system in New York City called the City's bail process Kafkaesque and likened it to "the DMV on steroids."

3.      As these well-documented problems went unaddressed for years, thousands of presumptively innocent detainees were jailed for hours or days in violation of court orders entitling them to release upon posting bail.

4.      The crucial role of bail in the proper functioning of the American criminal justice system has been recognized since the Founding.

5.      "This traditional right to freedom before conviction permits the unhampered preparation of a defense, and serves to prevent the infliction of punishment prior to conviction.  Unless this right to bail before trial is preserved, the presumption of innocence, secured only after centuries of struggle, would lose its meaning." *Stack v. Boyle*, 342 U.S. 1, 4 (1951) (citation omitted).

6.      Sadly, New York City's byzantine and inhumane bail system has placed the exercise of this foundational right out of reach for many New Yorkers.

7.      Each day, hundreds of criminal defendants have bail set by judges in courts across New York City.  The concept is simple: if the defendant can post the amount fixed by the judge, he or she is entitled to be released from detention.

8.      The reality is far more complicated.

9.      In practice, every day and night, friends, family members, and charitable organizations present themselves at New York City Department of Correction facilities with cash, cashier's checks, and money orders, asking to pay bail for a presumptively innocent person who is in jail—and they are turned away.  They are told that the computers or the fax machines

are not working; that the responsible staff is not available; that the person is not "eligible" to be released on bail because he or she is in the midst of the day-long ordeal of being processed for admission to a jail facility; or another of an endless supply of excuses. They are told to come back after lunch; to come back after the next shift change; to come back the next day.

10. Once the Department of Correction finally accepts a bail payment, the defendant should—and, according to the City itself, can—be released within no more than a few hours, as soon as his or her paperwork can be reviewed and a check for outstanding holds and warrants performed.

11. Instead, detainees often languish for a day or more after their bail has been posted—even though they are, by judicial order, entitled to release, and there is no lawful basis for continued restraints on their liberty. Such overdetentions are, as courts across the country have long held, unconstitutional.

12. Plaintiffs bring this civil rights lawsuit on behalf of themselves and those similarly situated to remedy the violation of their rights secured by New York law and the United States Constitution.

## JURISDICTION AND VENUE

13. This action arises under the Fourth and Fourteenth Amendments to the United States Constitution, 42 U.S.C. § 1983, and New York State common law.

14. This Court has subject matter jurisdiction over Plaintiffs' federal law claims pursuant to 28 U.S.C. §§ 1331 and 1343(a)(3)-(4) because Plaintiffs' claims arise under the laws of the United States, namely 42 U.S.C. § 1983, and seek redress of the deprivation, under color of state law, of rights guaranteed by the Constitution of the United States.

15. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367(a).

16. Venue lies in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant City of New York resides in this judicial district and Plaintiffs' claims arose in this judicial district.

## JURY DEMAND

17. Plaintiffs demand trial by jury in this action.

## PARTIES

18. Plaintiff James Lynch is a citizen of the United States and a resident of New York.

19. Plaintiff Lloyd Jones is a citizen of the United States and a resident of New York.

20. Plaintiff Baron Spencer is a citizen of the United States and a resident of New York.

21. Defendant City of New York (the "City") is a municipal corporation that, through its Department of Correction ("DOC"), operates jails that hold pre-trial detainees. The City, through DOC and otherwise, promulgates and implements policies, including those with respect to the processing of bail payments and the release of detainees from jail upon deposit of their bail amount.

# FACTS

### The City's Broken and Unconstitutional Bail Payment System

22. Under New York law, where a court has fixed bail in a criminal case, "cash bail in the amount designated in the order fixing bail may be posted" as soon as the defendant is taken into custody. N.Y. Crim. Proc. Law § 520.15(1). "Upon proof of the deposit of the designated amount the principal must be forthwith released from custody." *Id.*

23. For many years, however, New York City has displayed abject indifference to the rights of presumptively innocent pre-trial detainees to be released promptly upon posting bail.

24. In theory, bail can be paid at the courthouse after arraignment, or at DOC facilities including Rikers Island, the Brooklyn Detention Complex, the Manhattan Detention Complex, or the Vernon C. Bain Center in the Bronx.

25. In reality, the City's policies and practices around bail payment routinely impede detainees' ability to obtain release consistent with the judicial order setting their bail.

26. Although bail can theoretically be paid in court as soon as it is set at arraignment, in practice DOC frequently transfers defendants to jail before bail can be paid.[1] The Center for Court Innovation ("CCI")—a non-profit organization that conducts research and designs and implements programs to improve the functioning of the court system—found in

2015 that DOC frequently fails to honor bail "holds," instead transporting defendants to jail soon after arraignment without allowing an opportunity for friends or family to post bail.

27.      Because posting bail at court is so difficult, many defendants are transferred to jail from court unnecessarily.  For instance, statistics show that in 2014, close to half of the 12,880 defendants whose family or friends had the means to post bail early in the life of their criminal case were unable to do so immediately after arraignment, prior to the defendant's removal from court and transport to a detention facility.

28.      If a defendant is not permitted to post bail at the courthouse and DOC instead transports him or her to a DOC jail, an intake process begins that can last between 12 and 22 hours—or sometimes even longer.  This process consists of invasive and frequently demeaning medical screening, strip searches, and other jail intake procedures.

29.      Detainees are categorically ineligible to be released on bail for the duration of this intake process—even if the amount of their bail is available to be paid and is presented to DOC.  If a surety attempts to post bail for a detainee who is in the midst of the intake process, DOC staff may refuse to accept the paperwork altogether, or may physically accept the paperwork but refuse to begin processing it until the intake process had concluded.

30.       CCI's report found that DOC's refusal to process bail payments while a defendant is undergoing the jail intake process causes unnecessary delays in release.

---

[1] The New York City Criminal Justice Agency ("CJA") operates a Bail-Expediting Unit in all boroughs except Staten Island. This Unit assists defendants with low bails in contacting potential sureties and expediting posting, with the goal of reducing unnecessary pre-trial detention.  As part of this program, eligible defendants are theoretically placed on a two- or three-hour "hold" during which they remain at the courthouse, rather than being transported to jail, while they attempt to make bail from court.  In reality, in many instances this "hold" is illusory. Defendants will be transferred for reasons of expediency, such as because of a shift change or because a bus is leaving for the jail, and defendants are routinely transferred to detention even when family or friends are in the process of gathering the funds for bail.  Bail holds are also not consistently and uniformly honored.  In 2015, of the

31.     DOC's process for accepting bail payments is also badly infected with unnecessary delay.

32.     When a surety appears at a bail window to post bail, he or she is often made to wait for hours before speaking with DOC staff; this can be because the officer staffing the window is doing something else, at lunch, or for no apparent reason.

33.     Once the surety is seen by a bail clerk or officer, the officer checks to make sure the defendant has been processed (*i.e.*, that intake is complete) and is in DOC's system; confirms the inmate's identity, location, and bail amount; and initiates a check for warrants or holds on the defendant.

34.     Although this process can be completed in as little as 20 minutes, DOC often takes many hours to do it.

35.     CCI's report found that DOC gives low priority to processing bail payment and assigns insufficient staff to related tasks, causing unnecessary delays in processing and release.

36.     Other deficiencies in the City's bail payment processing system commonly cause further delays.  For example, computer systems at the Manhattan Detention Complex are taken down for overnight maintenance every Saturday.  Although the facility is designated as one where sureties can post bail for anyone detained by DOC, anyone who tries to post bail there on a Saturday evening is told to come back the next morning (or to leave their completed forms for later processing).

---

defendants eligible for the CJA Bail Expediting Program, only 18% of those in the Bronx, 16% in Brooklyn, 14% in Queens, and 9% in Manhattan succeeded in bailing from court.

37.     Likewise, the fax machine to which bail processing paperwork is sent at Rikers Island is often not monitored overnight, impeding DOC's ability to perform the checks prerequisite to accepting a bail payment.  Bail posters who encounter this scenario are simply told to come back in the morning and try again, while the defendant whose bail they are attempting to pay remains in jail.

38.     Moreover, if the defendant's bail amount has changed since arraignment (because of a bail review, issuance of a writ, etc.), it can take days for DOC to communicate with the court system to register the correct bail amount, causing further delays in those cases.

39.     CCI's 2015 report found that DOC's use of inadequate and "antiquated" paper records systems created confusion and uncertainty about the location of detainees, interfering with the ability to post bail and process detainees for release.  According to the report, "[s]takeholders unanimously believed that DOC's paper-based system makes every step of the process longer and more difficult."  CCI noted that holds and payments were tracked in a hard-copy log book that officers had to review manually.

40.     After the intake process has been completed and all of the required checks are complete, DOC accepts the bail amount, and the surety receives a time stamped receipt.

41.     Once bail is paid, the defendant is theoretically processed for release. Astoundingly—and unlawfully—it can take 24 hours or more for a detainee to be released *after bail is posted*.  Because of these delays, DOC often releases detainees in the middle of the night, when public transit options are more limited and homeless shelters frequently do not accept admission.

42. These egregious delays in processing detainees for release after bail has been posted result not from any legitimate governmental prerogative, but from indifference and administrative convenience.

43. For example, on information and belief, a DOC Captain must sign off on each bail release. DOC officers thus wait until a "critical mass" of bailed-out detainees has formed at a given facility so that the captain can sign off on the whole group at once. This can force a defendant who has already posted bail to wait hours until there are enough other detainees in the facility with posted bails to capture staff's attention.

44. Likewise, rather than return each bailed detainee's property and process releases promptly after bail has been paid, on information and belief, DOC waits until a critical mass of bailed defendants has gathered and processes their release as a group. While awaiting release, defendants who have been bailed out are moved from their housing area and held in a special cell or holding area designated specially for inmates whose bails have been posted. Only when this area fills up are all of the detainees present processed for release at once.

45. In other words, there is in effect a special holding area in DOC jails specifically for people *who have already been bailed out* and are therefore, by operation of a binding court order, no longer subject to DOC custody.

46. The City has long been aware of systemic problems and delays in the processing of bail payments and the widespread problem of resulting overdetentions.

47. For example, in August 2015, Vice News published an exposé entitled *"The DMV on Steroids": Paying Bail in New York Is Next to Impossible*. The piece exhaustively documented the widespread dysfunction and systemic inadequacy of the City's bail

payment system, noting that "the bail process is like a losing game of Life: Every mistake you make means three steps backward."

48.     The piece noted that it was "probably easier to buy a gun online than free a loved one from jail."

49.     In an interview for the Vice News exposé, City Councilman Rory Lancman—the Chair of the City Council's Courts & Legal Services Committee—stated that "[t]he bail process in New York City is like if Kafka wrote a novel on criminal justice. You don't know where to go, you don't know what to do, and you don't know when your loved one is even getting out."

50.     CCI's report was released in December 2015. Entitled *Navigating the Bail Payment System in New York City: Findings and Recommendations*, the report was based on months of empirical research, site visits to DOC facilities, and interviews conducted with stakeholders, including representatives of DOC and other City agencies.

51.     CCI recommended that the City create a consistent policy to ensure that holds are effectively communicated, tracked, and honored, "and are not disregarded due to transportation convenience or other issues." CCI also recommended that the City create "an office to receive complaints of violations of 'holds,' to track these complaints, and to draft quarterly reports" for the Mayor and City Council "detailing the number and context for 'hold' violations." On information and belief, these recommendations were ignored.

52.     CCI also recommended that DOC transition to a "comprehensive-computer based system" to ensure that confusion and uncertainty caused by its

antiquated paper- and fax-based tracking system did not continue to cause unnecessary overdetentions.  On information and belief, this recommendation was ignored.

53.     CCI reported that the bail payment and release process at DOC facilities is too long, and recommended that DOC "explore the creation of a time expectation and compliance-monitoring system for bail payment" that would use time stamps to track the time between when bail is posted and when a defendant is released.  CCI also recommended that DOC establish a telephone number "for bail payers or defendants to call when DOC takes an excessive amount of time."  On information and belief, these recommendations were ignored.

54.     CCI recommended that DOC address its woefully inadequate staffing of the bail process and use the opportunity of reductions in jail population to "reallocate DOC staff in order to adequately staff the bail payment process."  On information and belief, this recommendation was ignored.

55.     To address the overdetentions caused by DOC's refusal to accept and process bail payments while a detainee is undergoing intake processing, CCI recommended that DOC provide defendants a way to post bail immediately before or during the intake process to decrease unnecessary detention.  On information and belief, this recommendation was ignored.

56.     CCI also found that DOC's antiquated paper-based system meant that "all information and paperwork must currently be transmitted multiple times by fax from the site where the bail payer is to the site where the detainee is being held."  CCI found that "[a]ll stakeholders"—including DOC—"agree that the fax machines are often broken and that when this happens the entire process halts until the fax machines are working again."  CCI recommended that a computer-based system would "increase efficiency and widen options for

posting bail," reducing unnecessary detention. On information and belief, this recommendation was ignored.

57.     On April 2, 2017, the Independent Commission on New York City Criminal Justice and Incarceration Reform ("Lippman Commission") released a comprehensive report entitled *A More Just New York City*. The report echoed many of the conclusions and recommendations of CCI's 2015 report, including the implementation of automatic bail holds at arraignments and greater cooperation and assistance by DOC in facilitating bail payment, including at intake.

58.     The Lippman Commission projected that efforts to facilitate and expedite bail payment during the period of pretrial detention, even if implemented with 75% efficacy, could alone reduce the City's average daily jail population by hundreds of detainees.

***The City Effectively Admits There Is No Reason Class Members Could Not Have Been Released Within Five Hours After DOC Accepted Their Bail Payment***

59.     On June 21, 2017, the New York City Council passed a Local Law aimed at requiring DOC to facilitate the efficient processing of bail payments. *See* Int. 1531A-2017, N.Y.C. Council (2017). The law was adopted on July 22, 2017 pursuant to Section 37(b) of the City Charter as Local Law 2017/123.

60.     The law requires DOC to "accept cash bail payments immediately and continuously after an inmate is admitted to the custody of the department," *id.* § 9-148(a), and release "any inmate for whom bail or bond has been paid or posted within the required time period" after payment is made, *id.* § 9-148(b).

61. The "required time period" will be "five hours beginning on October 1, 2017, four hours beginning on April 1, 2018, and three hours beginning on October 1, 2018." *Id.* § 9-148(d).

62. The City Council's Fiscal Impact Statement for Int. 1531-A expressly stated that "there would be no impact on expenditures as a result of this legislation" because its mandates "can be implemented by existing personnel and resources at the Department of Correction."

63. Accordingly, the City has effectively admitted that DOC has always had the capacity—using existing resources and personnel and without the need for any additional funding—to release Class members within three to five hours after their bails were posted.

64. The City effectively has further conceded that three to five hours of delay constitutes a reasonable time within which DOC has always been capable of releasing detainees who had posted bail.

65. The City nonetheless detained members of the Class for many hours or days beyond the three to five hour threshold, without any legitimate governmental necessity.

66. These overdetentions resulted from the City's unconstitutional policies, practices, usages and/or customs and from its unlawful deliberate indifference to the constitutional rights of Class members.

*Plaintiff James Lynch*

67. Plaintiff James Lynch is 55 years old and lives in Brooklyn with his disabled god-sister, for whom he provides unpaid in-home care services such as cooking, cleaning, and grocery shopping.

68. Mr. Lynch was detained at the Anna M. Kross Center ("AMKC") on Rikers Island when the Bronx Freedom Fund posted his $500 bail by cashier's check on March 29, 2017.

69. According to a time-stamped receipt completed by DOC, the City received the payment for Mr. Lynch's bail at 3:56 p.m. on March 29, 2017.

70. Mr. Lynch's bail receipt contained a space with the printed instruction: "Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge. If none, write 'NONE.'" In this space, the DOC employee completing the form wrote: "NONE."

71. At approximately 8:00 or 8:30 p.m. on March 29, 2017, Mr. Lynch was informed by DOC personnel that his bail had been posted and that he should pack up his things in preparation for release.

72. Mr. Lynch complied with this direction and waited for a correction officer to arrive to escort him out of the housing area for release. Assuming he would not be spending the night in jail, Mr. Lynch gave his bedding away to other inmates.

73. No one came to get Mr. Lynch. He tried to inquire about his release and was told by DOC staff, in sum and substance, "someone will call you when they're ready."

74.     At around 11:00 p.m. on March 29—the designated "lights out" time at AMKC—Mr. Lynch realized that he was not going to be released and would have to spend the night in the housing area.  Mr. Lynch was forced to scramble to get his bedding back and spend the night in jail, despite having been bailed out hours earlier.

75.     Beginning around 4:00 the next morning, DOC personnel began preparing other inmates in Mr. Lynch's housing area who had court appearances that day to be transported to court.  Still, no one came to process Mr. Lynch's release.

76.     Mr. Lynch had a court date in Brooklyn that day (March 30).  He began to feel nervous that his delayed release would cause him to miss it.  Around 5:00 a.m., Mr. Lynch telephoned his daughter and left her a message requesting that she inform his attorney that he was at risk of being late to court because of his delayed release.

77.     Mr. Lynch asked a DOC officer about the status of his release.  He was told, in sum and substance, "someone will be along when they're ready."

78.     Finally, Mr. Lynch was able to get the attention of a DOC captain.  He informed her that he was due in court that day and begged her to expedite his release.

79.     Mr. Lynch was finally escorted out of his housing area at AMKC around 9:00 a.m. on March 30.

80.     However, instead of being released directly, he was brought to the intake area, where he was held in a cell for several additional hours.

81.     My. Lynch was finally released from Rikers Island at approximately 2:40 p.m. on March 30, 2017, nearly 23 hours after his bail was posted.

82.     There was no justification for this overdetention.

83.     Mr. Lynch's overdetention resulted from the City's unconstitutional policies, practices, usages and/or customs and from its unlawful deliberate indifference to the constitutional rights of Class members.

84.     Because of his delayed release, Mr. Lynch missed his March 30 court date, and a bench warrant was ordered for him.  The warrant was ultimately stayed pending Mr. Lynch's appearance at an adjourned court date.

***Plaintiff Lloyd Jones***

85.     Plaintiff Lloyd Jones was arrested in the Bronx at approximately 10:30 a.m. on January 6, 2017.

86.     Mr. Jones was arraigned at approximately noon on January 7.

87.     Although the New York City Criminal Justice Agency—an independent organization that assesses New York City arrestees for pretrial release—recommended that Mr. Jones be released on his own recognizance, the arraignment judge set bail at $2,000.

88.     Based on assurances that Mr. Jones would be held at the courthouse for a short period to allow him to post bail before being transported to jail, Mr. Jones's friends and family pitched in funds to pay his $2,000 bail in cash.

89.     A friend attempted to post bail for Mr. Jones at approximately 12:30 p.m. on January 7.  He was told that Mr. Jones's bail could not be accepted yet and directed to come back "after lunch" (*i.e.*, not before 2:00 p.m.).

90.     Before Mr. Jones's friend was permitted to post his bail at the courthouse, DOC placed Mr. Jones on a bus to the Vernon C. Bain Center ("VCBC").  By the time his friend

reappeared at the bail window just after 2:00 p.m., he was told that Mr. Jones had already been taken to jail, and was therefore no longer eligible to be bailed out from court.

91.     Mr. Jones's friend called DOC repeatedly that afternoon to ask whether Mr. Jones was eligible to be bailed out.  He was told alternately that Mr. Jones was not in DOC's "system," or that no information could be provided over the phone.

92.     Finally, around 8:00 p.m., Mr. Jones's friend drove to VCBC and attempted to post bail for Mr. Jones in person.

93.     DOC staff at VCBC confirmed that Mr. Jones was there, but told his friend that he had not yet completed intake processing and thus could not yet be released on bail.

94.     DOC advised Mr. Jones's friend to check back after midnight.

95.     Mr. Jones's friend called back after midnight on January 8, 2017 and was told that the person responsible for processing bail was no longer there, and that DOC would therefore be unable to accept a bail payment for Mr. Jones that night.

96.     Mr. Jones spent the night in jail despite the fact that his friend was ready, willing, and able to post his bail approximately 30 minutes after his arraignment.

97.     At approximately 10:30 a.m. on January 8, a friend of Mr. Jones and Mr. Jones's mother traveled in person to VCBC and were finally able to post bail for Mr. Jones.  On information and belief, Mr. Jones's bail receipt contained a space with the printed instruction: "Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge.  If none, write 'NONE.'"  On information and belief, the DOC employee completing the form wrote "NONE" in this space.

98.     At the time they posted bail for Mr. Jones, Mr. Jones's mother and friend were told that he should be released by approximately 3:00 p.m. on January 8.

99.     However, Mr. Jones was not even told that his bail had been paid until late that afternoon.  He was then told that his paperwork was still being processed, and was forced to wait in his cell at VCBC for approximate two more hours, despite the fact that DOC's legal basis for detaining him had dissipated hours earlier.

100.     At approximately 7:00 p.m., Mr. Jones was moved to a new cell in the VCBC intake area, where he waited to be released with several other detainees whose bails had already been paid.

101.     Mr. Jones was not released until approximately 8:00 p.m. on January 8— over 30 hours after his friends first attempted to pay his bail at the courthouse, and approximately 9 to 10 hours after DOC accepted his bail payment.

102.     There was no justification for this overdetention.

103.     Mr. Jones's overdetention resulted from the City's unconstitutional policies, practices, usages and/or customs and from its unlawful deliberate indifference to the constitutional rights of Class members.

### Plaintiff Baron Spencer

104.     Plaintiff Baron Spencer was arrested at his home in the Bronx on December 14, 2015.

105.     Mr. Spencer was arraigned on December 15, 2015 in New York City Criminal Court in the Bronx.  His bail was set at $1,000.

106. On December 19, 2015, a representative of the Bronx Freedom Fund appeared at the bail window at VCBC with a cashier's check for $1,000 from Chase Bank in order to pay Mr. Spencer's bail.

107. At the time, Mr. Spencer was being housed at AMKC.

108. According to a time-stamped receipt completed by DOC, the City received the payment for Mr. Spencer's bail at 1:38 p.m. on December 19, 2015.

109. Mr. Spencer's bail receipt contained a space with the printed instruction: "Describe any outstanding warrants or detainers, including surety examination, prohibiting defendant's immediate discharge. If none, write 'NONE.'" In this space, the DOC employee completing the form wrote: "NONE."

110. Mr. Spencer was not told that his bail had been paid until approximately 11:30 p.m. or midnight on the night of December 19, approximately 10 hours after the City accepted the funds.

111. Mr. Spencer was told to pack up and was escorted by DOC personnel from his dormitory at AMKC to the intake area. Although his bail had been paid approximately ten hours earlier and DOC had no legal basis to continue detaining him, he was placed in a large cell with approximately six or seven other detainees. Mr. Spencer was forced to attempt to sleep on the cold floor.

112. A number of DOC officers were present in the intake area overnight. One officer was sleeping; others were chatting or eating food. None appeared to be doing anything related to processing detainees for release.

113.    Mr. Spencer was finally released from jail in the early morning hours of December 20, 2016.  He was detained for approximately 18 hours after his bail was paid.

114.    There was no justification for this overdetention.

115.    Mr. Spencer's overdetention resulted from the City's unconstitutional policies, practices, usages and/or customs and from its unlawful deliberate indifference to the constitutional rights of Class members.

## CLASS ACTION ALLEGATIONS

116.    Plaintiffs bring this suit as a class action under Federal Rule of Civil Procedure 23(b)(3), on behalf of themselves and other individuals similarly situated who (a) were detained in any DOC jail facility; (b) received a judicial order fixing bail pursuant to Title P of Part Three of Chapter 11-A of the New York Criminal Procedure Law ("C.P.L."); (c) "posted bail" as that term is defined in Section 500.10(8) of the C.P.L.; and (d) were not released from DOC custody within a reasonable time after someone was ready, willing, and able to post bail on their behalf.

117.    All of the members of the Class were injured as a result of Defendant's conduct.

118.    On information and belief, bail is posted in over 30,000 criminal cases in New York City annually, and a substantial number of the defendants in those cases are members of the Class.  Accordingly, the members of the Class are so numerous that joinder of all Class members is impracticable.

119.    The questions of law and fact presented by Plaintiffs are common to other members of the Class.  Among others, the questions of law and fact common to the Class are:

a. Whether the Constitution imposes limits on the length of time for which the City may lawfully detain a criminal defendant after he or she has posted bail or after the City has refused to accept bail;

b. Whether the City has exceeded those limits with respect to the Class;

c. Whether the City has had a policy, custom, usage and/or practice of detaining individuals for prolonged periods after they had posted or sought to post bail;

d. Whether such a policy, if found to have existed, violates the United States Constitution and/or New York law;

e. Whether the City has applied its policies, including those with respect to the processing of bail payments and the release of detainees from jail upon deposit of their bail amount, in an unconstitutional manner;

f. Whether the City has acted with deliberate indifference to the rights of Class members by detaining them for prolonged periods after they had posted or sought to post bail; and

g. Whether members of the Class are entitled to relief and, if so, the nature and extent of that relief, including without limitation the amount of monetary damages.

120. Common issues of law and fact, including without limitation those set forth above, predominate over any individual issues.

121.    The claims and practices alleged herein are common to all members of the Class.

122.    The violations suffered by Plaintiffs are typical of those suffered by the Class, as all members of the Class were subjected to prolonged overdetentions in a New York City jail after posting or seeking to post bail.  The entire Class will benefit from the monetary relief sought.

123.    Plaintiffs have no conflict of interest with any Class members, are committed to the vigorous prosecution of all claims on behalf of the Class, and will fairly and adequately protect the interests of the Class.

124.    Counsel competent and experienced in federal class action and federal civil rights litigation has been retained to represent the class.  Emery Celli Brinckerhoff & Abady LLP is a law firm with offices in New York City with extensive experience in complex civil rights litigation and class action lawsuits.  Romano & Kuan PLLC is a law firm in New York City with extensive experience in complex civil rights litigation and knowledge of New York criminal procedure and practice.

125.    This class action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all Class members is impracticable.  The damages suffered by members of the Class, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt individual redress for damages.

126.    There will be no extraordinary difficulty in the management of this Class action.

## FIRST CAUSE OF ACTION
### 42 U.S.C. § 1983—All Plaintiffs and Those Similarly Situated

127.     Plaintiffs repeat, reiterate and reallege each and every allegation contained in the foregoing paragraphs of this complaint with the same force and effect as though set forth herein.

128.     City administrators, policymakers, supervisors, and employees caused the unjustified overdetention of Plaintiffs and all other members of the Class by deliberate indifference to the risk of constitutional injury from overdetention arising from, *inter alia*: DOC's refusal to provide a reasonable period of time in which to post bail before being transported to a DOC facility from court; DOC's routine failure to honor bail expediting holds; DOC's policy of refusing to accept and/or process bail payments at any time between when a defendant leaves court and when intake processing is complete up to 22 or more hours later; DOC's knowing use of defective, outdated, and plainly inadequate paper documentation systems and fax machines to process bail payments and attendant releases; DOC's failure to assign adequate staff to the bail processing system, though it could do so without incurring additional costs; delays in accepting bail payments for eligible detainees; unnecessary delays between payment and release processing resulting from DOC's preference for batching a "critical mass" of releases together; the use of designated areas to continue holding inmates who have already been bailed out, despite the absence of any legal authority for their continued detention; and/or the failure to train and/or supervise and/or discipline DOC staff to ensure and effectuate the prompt release of detainees whose bails have been paid or sought to be paid within a reasonable amount of time after payment.

129.    The City has had a policy, practice, custom, and/or usage of detaining criminal defendants longer than reasonably necessary after they posted bail, thereby causing the unjustified overdetention of Plaintiffs and all other members of the Class.

130.    Overdetaining a presumptively innocent criminal defendant who has posted or sought to post bail is an unreasonable seizure and a deprivation of liberty without due process of law and thus violates the Fourth and Fourteenth Amendments to the United States Constitution.

131.    At all relevant times, Defendant acted under pretense and color of state law, and its acts were without authority of law and in abuse of its powers.

132.    As a direct and proximate result of the misconduct and abuse of authority detailed above, each of the Plaintiffs and all other members of the Class suffered loss of liberty and other damages to be determined at trial.

## SECOND CAUSE OF ACTION
### False Imprisonment—Plaintiffs Lynch and Jones and Those Similarly Situated

133.    Defendant City, through its officials, employees, agents, servants, and/or representatives, intentionally caused the confinement of Plaintiffs Lynch and Jones and all other members of the Class in the custody of DOC for an unreasonable amount of time after each of them had posted or sought to post bail.

134.    Plaintiffs Lynch and Jones and all other members of the Class were conscious of said confinement.

135.    Neither Plaintiff Lynch, Plaintiff Jones, nor any other members of the Class, consented to said confinement.

136.    Said confinement was not privileged because any judicial authorization therefor dissipated upon the payment of the bail amount set by the arraignment judge.

137.    Under the doctrine of *respondeat superior*, Defendant City is liable for the tortious conduct of its employees and agents that caused the unlawful confinement hereinbefore alleged.

138.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs Lynch and Jones and all other members of the Class suffered loss of liberty and other damages to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of the Class, request the following relief as against Defendant:

1. An order certifying this suit as a class action pursuant to Federal Rule of Civil Procedure 23;

2. A judgment declaring that Defendant has committed the violations of law alleged in this action;

3. Compensatory damages against Defendant in an amount to be proven at trial, together with interest as allowed by law;

4. An order awarding Plaintiffs reasonable attorneys' fees, together with the costs and disbursements of this action, pursuant to 42 U.S.C. § 1988 and the inherent powers of this Court; and

5. Such other and further relief that may be just and proper.

Dated: October 4, 2017
New York, New York

EMERY CELLI BRINCKERHOFF
& ABADY LLP

By:_____/s/_____
        Matthew D. Brinckerhoff
        Debra R. Greenberger
        David A. Lebowitz
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

ROMANO & KUAN, PLLC
        Julia P. Kuan
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5075

*Attorneys for Plaintiffs and the Putative Class*