UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————

LLOYD JONES and BARON SPENCER, on Behalf
of Themselves and Others Similarly Situated,

                                        Plaintiffs,

              - against -

CITY OF NEW YORK,

                                        Defendant.

———————————————————————

ECF Case

No. 17 Civ. 7577


# MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
# FOR FINAL APPROVAL OF SETTLEMENT


Emery Celli Brinckerhoff Abady Ward & Maazel LLP
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

## TABLE OF CONTENTS

PAGE NO(s)

TABLE OF AUTHORITIES ................................................................................ -vi

INTRODUCTION ............................................................................................... 1

I.    FACTUAL AND PROCEDURAL HISTORY ..................................... 3

    A.    The Extensive Investigation of the City's Bail Practices, and the Complaint Filed on Behalf of the Plaintiff Class ........................... 3

    B.    Class Counsel Conducts Relentless and Exhaustive Discovery to Document and Prove the Existence of Unlawful Bail Practices ............................................................... 5

    C.    The Parties Negotiate Meaningful Monetary and Non-Monetary Settlement Terms for the Settlement Class ................................................................................... 7

    D.    The Notice Program and Claims Process ................................... 10

II.    THE PROPOSED SETTLEMENT AGREEMENT ............................ 12

    A.    The Settlement Class ............................................................... 12

    B.    Monetary Relief for the Settlement Class ................................. 12

        1.    Monetary Benefits ........................................................ 12

        2.    Other Non-Monetary Settlement Terms ....................... 13

        3.    Releases ....................................................................... 15

    C.    Notice to the Class and Their Response ................................... 15

    D.    Attorneys' Fees and Costs and Service Awards ....................... 17

III.    THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND SHOULD BE APPROVED IN ALL RESPECTS ............................................................................. 18

    A.    Adequacy of Representation ..................................................... 19

    B.    Arm's Length Negotiations ...................................................... 23

    C.    Adequacy of Relief .................................................................. 24

1.    Costs, Risk, Delay of Trial and Appeal ........................................ 24

2.    Effectiveness of the Proposed Method of
Distributing Relief ....................................................................... 26

3.    The Terms of Any Proposed Award of Attorneys'
Fees and Expenses ....................................................................... 29

4.    Any Agreement Required to be Identified
Under Rule 23€(3) ....................................................................... 30

5.    Reaction of the Class to the Settlement: Objections
and Exclusions ............................................................................. 30

      a.    Frederick Williams............................................................. 31

      b.    S.A. .................................................................................... 34

6.    Other *Grinnell* Adequacy Factors ................................................ 37

7.    Equitable Treatment of Class Members........................................ 40

IV.    THE NEGOTIATED SERVICE PAYMENTS PROPOSED
FOR THE NAMED PLAINTIFFS ARE FAIR AND
REASONABLE ...................................................................................... 41

      A.    Courts Commonly Award Service Payments to Class
Representatives Who Provide Substantial Assistance .............................. 41

      B.    The Amount of the Proposed Service Awards in this
Case is Appropriate in Light of the Class Recovery
and Similar Service Awards Approved in this Circuit............................. 44

V.    FINAL CERTIFICATION OF THE RULE 23 SETTLEMENT
CLASS IS APPROPRIATE...................................................................... 45

CONCLUSION.................................................................................................... 45

## <u>TABLE OF AUTHORITIES</u>

<u>PAGE NO(s)</u>

**Cases**

*Brotherton v. Cleveland*,
    141 F. Supp. 2d 907 (S.D. Ohio 2001) .......................................................... 44

*Caballero v. N.Y.S. Dep't of Corr. & Comm'ty Supervision*,
    No. 20 Civ. 1470 (N.D.N.Y.) ..................................................................... 22

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco*
    *Managed Care, L.L.C.*,
    504 F.3d 229 (2d Cir. 2007) ....................................................................... 36

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ................................................................. passim

*Dickerson v. York Int'l Corp.*,
    No. 1:15-CV-1105,
    2017 WL 3601948 (M.D. Pa. Aug. 22, 2017) ................................................ 33

*Droegemueller v. Petroleum Dev. Corp.*,
    2009 WL 961539 (Dist. Ct. Colo. Apr 7, 2009) ............................................ 43

*Dupler v. Costco Wholesale Corp.*,
    705 F. Supp. 2d 231 (E.D.N.Y. 2010) .......................................................... 29

*EEOC v. McDonnell Douglas Corp.*,
    894 F.Supp. 1329 (E.D.Mo.1995) ............................................................... 32

*Enter. Energy Corp. v. Columbia Gas Transmission Corp.*,
    137 F.R.D. 240 (S.D. Ohio 1991) ................................................................ 44

*Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*,
    62 F.4th 704 (2d Cir. 2023) ........................................................................ 41

*Hernandez v. Merrill Lynch & Co., Inc.*,
    No. 11 Civ. 8472,
    2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012) ................................................ 18

*Hezi v. Celsius Holdings, Inc.*,
    No. 1:21 Civ. 09892 (JHR),
    2023 WL 2786820 (S.D.N.Y. Apr. 5, 2023) ................................................. 45

*Hyland v. Navient Corp.*,
    48 F.4th 110 (2d Cir. 2022) ........................................................................ 41

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014) ................................................................. 27

*In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*,
    2008 WL 4974782 (E.D. Pa. Nov. 21, 2008) .................................................. 42

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000) ............................................................... 24

*In re Chinese-Manufactured Drywall Prod. Liab. Litig.*,
    424 F. Supp. 3d 456 (E.D. La. 2020) .............................................................. 33

*In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*,
    No. 3:08-MD-01998,
    2010 WL 3341200 (W.D. Ky. Aug. 23, 2010) ................................................. 32

*In re Crazy Eddie Sec. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) .................................................................. 39

*In re Deepwater Horizon*,
    739 F.3d 790 (5th Cir. 2014) ............................................................................ 32

*In re Drexel Burnham Lambert Grp., Inc.*,
    130 B.R. 910 (S.D.N.Y. Aug. 27, 1991) .......................................................... 36

*In re Global Crossing Sec. and ERISA Litig.*,
    225 F.R.D. 436 (S.D.N.Y. 2004) ..................................................................... 37

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019) ........................................... 19, 20, 24, 37

*In re Initial Public Offering Sec. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009) ............................................................. 39

*In re LIBOR-Based Fin. Instruments Antitrust Litig.*,
    No. 11 Civ. 5450 (NRB),
    2016 WL 7625708 (S.D.N.Y. Dec. 21, 2016) ................................................ 36

*In re Nissan Radiator/Transmission Cooler Litig.*,
    No. 10 CV 7493,
    2013 WL 4080946 (S.D.N.Y. May 30, 2013) ................................................. 32

*In re Oil Spill by Oil Rig Deepwater Horizon*,
    910 F. Supp. 2d 891 (E.D. La. 2012) .............................................................. 32

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) ..................................................................... 26

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
   330 F.R.D. 11 (E.D.N.Y. 2019) ...................................................................... 27, 38

*In re Platinum & Palladium Commodities Litig.*,
   No. 10 Civ. 3617,
   2015 WL 4560206 (S.D.N.Y. July 7, 2015) ......................................................... 34

*In re Warfarin Sodium Antitrust Litig.*,
   391 F.3d 516 (3d Cir. 2004) .................................................................................. 18

*In re WorldCom, Inc. Sec. Litig.*,
   388 F. Supp. 2d 319 (S.D.N.Y. 2005) ................................................................... 27

*Ingram v. The Coca-Cola Co.*,
   200 F.R.D. 685 (N.D. Ga. 2001) ........................................................................... 44

*Liberte Capital Grp. v. Capwill*,
   No. 5:99 Civ. 818,
   2007 WL 2492461 (N.D. Ohio Aug. 29, 2007) ..................................................... 44

*McBean v. City of New York*,
   233 F.R.D. 377 (S.D.N.Y. 2006) ..................................................................... 29, 44

*Morris v. Affinity Health Plan, Inc.*,
   859 F. Supp. 2d 611 (S.D.N.Y. 2012) ................................................................... 30

*Nichols v. Noom, Inc.*,
   No. 20 Civ. 3677 (KHP),
   2022 WL 2705354 (S.D.N.Y. July 12, 2022) ....................................................... 19

*Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*,
   688 F.2d 615 (9th Cir. 1982) ................................................................................. 32

*Pearlstein v. BlackBerry Ltd.*,
   No. 13 Civ. 7060(CM)(KHP),
   2022 WL 4554858 (S.D.N.Y. Sept. 29, 2022) ...................................................... 33

*Peterson v. Alaska Commc'ns Sys. Grp., Inc.*,
   No. 3:12 Civ. 00090 (TMB)(MMS),
   2022 WL 788399 (Dist. Ct. Alaska Mar. 15, 2022) .............................................. 43

*Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*,
   636 F.3d 235 (6th Cir. 2011) ................................................................................. 32

*Qsberg v. Foot Locker, Inc.*,
   No. 07 Civ. 1358, ECF No. 423 (S.D.N.Y. June 8, 2018) ..................................... 34

*Roberts v. Texaco, Inc.*,
    979 F. Supp. 185 (S.D.N.Y. 1997)................................................................. 41, 42, 43, 44

*Schwartz v. Intimacy in New York, LLC*,
    No. 13 CV 5735 (PGG),
    2015 WL 13630777 (S.D.N.Y. Sept. 16, 2015)............................................ 29

*Sierra v. City of New York*,
    No. 20 Civ. 10291 (S.D.N.Y.) ..................................................................... 22

*Sullivan v. DB Invs., Inc.*,
    667 F.3d 273 (3d Cir. 2011)........................................................................ 17

*Sykes v. Harris*,
    No. 09 Civ. 8486 (DC),
    2016 WL 3030156 (S.D.N.Y. May 24, 2016) ................................................ 31

*Thacker v. Chesapeake Appalachia, L.L.C.*,
    695 F. Supp. 2d 521 (E.D. Ky. 2010) ............................................................ 32

*Tiro v. Pub. House Invs., LLC*,
    Nos. 11 Civ. 7679(CM), 11 Civ. 8249(CM),
    2013 WL 4830949 (S.D.N.Y. Sept. 10, 2013)................................................ 30

*Van Vranken v. Atl. Richfield Co.*,
    901 F. Supp. 294 (N.D. Cal. 1995) ............................................................... 44

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005)......................................................... 18, 23, 30, 38

*Wright v. Stern*,
    553 F. Supp. 2d 337 (S.D.N.Y. 2008)............................................................ 44

*Yeend v. Akima Global Servs., LLC*,
    No. 20 Civ. 1281 (N.D.N.Y.) ........................................................................ 22

**Statutes**

42 U.S.C. § 1983 .................................................................................................. 4

N.Y. C.P.L. § 160.50 ........................................................................................... 42

**Rules**

Fed. R. Civ. P. 23(e)(2)................................................................................. passim

## INTRODUCTION

Plaintiffs Lloyd Jones and Baron Spencer ("Class Representatives" or "Named Plaintiffs"), individually and on behalf of the class of over 70,000 individuals they represent (collectively, "Plaintiffs" or "Class Members"), and Defendant City of New York ("Defendant" or "City") (altogether, the "Parties") settled this class action lawsuit in October 2022. This Court preliminarily approved the settlement agreement ("Settlement") on December 1, 2022. *See* ECF No. 179. Plaintiffs now seek final approval of the Settlement and enter the proposed Final Approval Order which the City has approved.

This suit arose from allegations that the City's Department of Correction ("DOC") detained thousands of people in their custody for hours or days after they were entitled to be released on bail from DOC custody. Under the Settlement, the City agrees to pay Class Members—which numbers over 70,000 individuals—$3,500 for each time they were released on bail from DOC custody between October 4, 2014 and October 21, 2022, provided Class Members filed a claim attesting that they reasonably believed that their release on bail was delayed for at least three hours.

The response by Class Members to the Settlement has been extraordinary: 38% of Class Members have filed timely, valid claims, representing 43% of the total instances of overdetention; this number will undoubtedly rise as certain deficient claims are corrected and valid untimely claims are accepted. That claim or return rate outstrips the average return rate by far; the vast majority of class action settlements offering monetary benefits receive claims from under 10% of Class Members, and often even fewer. The value of timely claims currently stands at $141,256,500, and it too will rise once deficient and untimely claims are validated. At $141 million this Settlement is easily the largest total monetary settlement of a Section 1983 civil rights class action against the City of New York within the last ten years, if not of all time.

1

The unprecedented success of this Settlement flows from three key factors. *First*, after defeating the City's motion to dismiss, Class Counsel spent almost three years relentlessly pursuing the discovery needed to prove the claims. Through hard-fought discovery motion practice, production of hard copy and electronic data from countless sources (almost 385,000 pages of documents), numerous depositions, third-party subpoenas, transcription of hard copy records, and detailed analysis by a data expert, Class Counsel assembled the most comprehensive set of data of the length and severity of over-detention in DOC facilities ever created. Not only did the discovery process yield the evidence needed to go to trial, it provided a fulsome basis for Class Counsel to enter settlement negotiations and obtain significant monetary and non-monetary benefits for the Class.

*Second*, the Settlement provides significant monetary value to individual Class Members, so Class Members had every incentive to submit claims. Class Members who were released once during the class period and experienced delay will receive $3,500—a meaningful sum of money—while Class Members who were released multiple times will receive $3,500 for each instance of delay. In addition to offering Class Members substantial monetary recovery, the Settlement is structured so that the Class Members' monetary awards are *not* reduced by costs of settlement administration and notice (almost $2 million), attorneys' fees and costs, and service awards to the Named Plaintiffs. The City will pay these items separately and *in addition to* the monetary awards received by Class Members. Class Members will receive non-monetary terms that are immensely valuable: a limitation on liens that can be deducted, government benefits counseling, a lengthy untimely claims period with a permissive standard for showing good cause, and uncashed checks will escheat instead of reverting to the City. Many of these Settlement terms are believed to be first-of-their-kind in a civil rights class action settlement with the

City.

*Third*, the Settlement uses innovative approaches for notice and ensures that filing a claim is non-burdensome. Rust Consulting, the settlement administrator (the "Administrator"), oversaw a multi-media direct and publication notice program, including radio and television ads; ads on subways, bus shelters, and transit stations; internet and social media advertising; ads in newspapers and magazines; and direct flyering in neighborhoods and locations most likely to be frequented by Class Members and their loved ones. Alongside Rust's notice program, Class Counsel communicated with dozens of public defender organizations and criminal defense attorneys; education institutions; homeless shelters and housing projects; social and legal service organizations working with Class Members; and Class Members in state prisons.  The claim submission process was streamlined, with no documentary requirements, and offered mail or online options.

Taken together, the litigation efforts of Class Counsel, the meaningful Settlement terms, widespread notice, and a simplified claims process, have yielded a historic outcome for Class Members. Because the Settlement satisfies the criteria for final approval, Plaintiffs respectfully request that the Court grant final approval of the settlement agreement between the Parties dated October 21, 2022 (the "Settlement" or "Settlement Agreement"), Ex. 1 to the Declaration of Debra L. Greenberger ("Greenberger Decl.") and enter the proposed final approval order attached as Exhibit 2 to the Greenberger Declaration and approved by both Parties.

## I.   FACTUAL AND PROCEDURAL HISTORY

### A.   The Extensive Investigation of the City's Bail Practices, and the Complaint Filed on Behalf of the Plaintiff Class

Before filing the Complaint, Plaintiffs extensively investigated DOC's bail practices—in particular, DOC's inability to accept bail, and even after accepted, to release people who had

posted bail in a timely way. *See* Greenberger Decl. ¶ 5. Plaintiffs interviewed people subjected to these obstacles and delays, and spoke with numerous public defenders and other organizations about their client's experiences, patterns, and the causes of these delays. *Id.* Plaintiffs also reviewed reports from the Lippman Commission on Rikers Island and New York City Council regarding the City's bail practices, delays, and systemic issues that prevented DOC from accepting bail and delayed the release of incarcerated people. *Id.* Named Plaintiffs provided detailed information about their own experiences with DOC's intake, bail, and release practices. *Id.* Using the information gathered from Plaintiffs' extensive pre-suit investigation, Plaintiffs filed highly detailed pleadings.

The Complaint was filed against the City on October 4, 2017 by Named Plaintiffs Lloyd Jones, Baron Spencer, and James Lynch, on behalf of themselves and a putative class.[1] ECF No. 1. Plaintiffs alleged a violation of the Fourth and Fourteenth Amendments pursuant to 42 U.S.C. § 1983 and false imprisonment under New York law. *Id.* Despite the requirements of local law, *id.* ¶¶ 60-61, DOC detained incarcerated individuals for many hours or days beyond the three-hour threshold, without any legitimate governmental need. *Id.* ¶ 65. DOC refused to accept or process bail payments until an individual had completed processing at a DOC jail facility—a process that took 22 hours or more—even if the bail amount was available and presented to DOC. *Id.* ¶¶ 29-30, 55, 128. Using defective, outdated, and inadequate systems, combined with failure to assign adequate staff, along with other deficiencies, DOC routinely held people for hours or days after they posted bail. *Id.* ¶¶ 42-44, 128.

---

[1] On June 17, 2022, the Court dismissed James Lynch's claims against the City because of his death. ECF No. 158.

Plaintiffs defeated the City's motion to dismiss, which challenged whether Plaintiffs had alleged a constitutional violation; whether Plaintiffs had sufficiently alleged liability of the City under *Monell v. Department of Social Services of City of New York*, 436 U.S. 658 (1978); whether Plaintiffs possessed a claim for compensatory damages given their lack of physical injury; and whether the Court should retain supplemental jurisdiction over Plaintiff's state law claim of false imprisonment. ECF No. 24, 26, 27. The Court denied the motion to dismiss on September 28, 2018. ECF No. 32.

### B. Class Counsel Conducts Relentless and Exhaustive Discovery to Document and Prove the Existence of Unlawful Bail Practices

Over the course of three years, Class Counsel exhaustively and diligently pursued all avenues of discovery for evidence proving Plaintiffs' claims, i.e., whether, how, and for what length of time DOC over-detained Class Members. Greenberger Decl. ¶¶ 10-20. Class Counsel propounded numerous rounds of discovery requests and took ten depositions of DOC employees, including two Fed. R. Civ. P. 30(b)(6) depositions. *Id.* ¶¶ 10-14. Through these depositions, informal conversations with current and former DOC employees, and other documents and reports, Class Counsel often learned of the existence of data that could be used to demonstrate when Class Members posted bail and when they were discharged from DOC custody. *Id.* ¶ 16. This led to subsequent rounds of discovery demands and third-party subpoenas, including to other municipal agencies. *Id.* ¶¶ 15-16. Class Counsel had to collect data from such a wide variety of sources because, contrary to its own regulations, DOC did not maintain accurate documentation of when individuals entered and exited its custody, or when individuals had their bail paid. *Id.* ¶ 16.

Class Counsel obtained, often over DOC's objections and after contested letter-motion practice before the Court, the production of almost 385,000 pages of documents. *Id.* ¶ 10, 19.

The parties filed over a dozen such letters with the Court, laying out their positions on a range of discovery and settlement disputes. *Id.* The Court almost uniformly ruled for Class Counsel in discovery disputes and ordered a monthly status report from the parties to ensure that the City timely produced the relevant discovery. *Id.* These documents ranged from relevant policies, practices, and directives to multiple sets of electronic and hard copy data maintained by DOC regarding the movement of incarcerated individuals. *Id.* ¶ 11. This last collection of data included various electronic and hard copy logs and logbooks, property release records, electronic databases and their back-end archival backups (audit logs) showing updates to certain fields in DOC's databases, fax receipts showing when bail was posted, and data from electronic vendors working for DOC, including on online bail systems, credit card transactions, and the functioning of certain bail payment kiosks at DOC facilities. *Id.* Class Counsel thought creatively to identify data that could be used to identify key points in time, for example, seeking data when DOC issued MetroCards to individuals being discharged from DOC custody as a proxy for the time individuals were released from DOC custody. *Id.* ¶ 17.

Class Counsel then reviewed, digested, and analyzed the data. For example, Class Counsel hired a third-party service to transcribe thousands of bail receipts and had numerous logbooks transcribed in house, tasks that were essential to calculate the length of over-detention. *Id.* ¶ 12. Class Counsel also reviewed thousands of pages of ESI and emails, and its data analyst expert and consultant matched data across numerous datasets to determine the length and severity of over-detention in DOC facilities. *Id.* ¶¶ 18-19.

Class Counsel had identified additional tranches of hard-copy documents with bail payment and release timings when the City entered into settlement negotiations and discovery was deferred by mutual agreement. *Id.* ¶ 12.

Once the parties were engaged in productive settlement discussions, Class Counsel issued subpoenas to locate class members for the purpose of disseminating notice, including a FOIL request and then a subpoena to the New York State Department of Corrections and Community Supervision ("DOCCS") and New York State Office of Information Technology ("ITS") for contact details for Class Members in the custody of the state prison system. *Id.* ¶ 20.

### C.   The Parties Negotiate Meaningful Monetary and Non-Monetary Settlement Terms for the Settlement Class

The Parties began negotiating settlement seriously in January 2021. They identified a settlement framework and largely agreed to pause further discovery while negotiations proceeded.

Class Counsel analyzed data analysis that could support the strongest possible position for Plaintiffs in settlement negotiation. For example, Class Counsel estimated the number of individual instances of people being released from DOC custody on bail within the class period; analyzed the reliability and completeness of various DOC data on intake, bail payment, and release, including by checking it for internal consistency and cross-checking it against other sources of data; calculated an estimate of the average time that people were detained during the class period, broken out by facility, year, and time of year, using data from DOC movement records, property records, bail receipts, RFID data, hard-copy logbooks, sign-in/sign-out sheets, MetroCard logbooks, and online bail payment records; analyzed how many Class Members were detained on one occasion as compared to multiple occasions; and compared City data about Class Members to state data obtained through FOIL, databases from other non-parties, and data from within DOC internal audits and records. *Id*. ¶ 22.

From January 2021 through October 2022, the Parties conferred on multiple occasions to negotiate Settlement terms. *Id*.  ¶¶ 21-37. By September 2021, the Parties had reached an agreement in principle as to the $3,500 amount afforded to each instance of alleged over-

detention with any settlement related costs (administration, notice, class representative bonuses, and attorneys' fees and costs) to be paid separately by the City. *Id*. ¶ 25.

Class Counsel continued to negotiate, however, for the next year over non-monetary settlement terms for the benefit of Class Members. *Id.* ¶ 26. For example, Class Counsel negotiated a framework for identification of Class Members and a simple claim verification process: DOC agreed to provide a list of all individuals who were released on payment of bail according to its electronic records (the "City's List") and agreed that those individuals would be presumptively considered part of the Settlement Class and for a settlement award. *Id.* Individuals on the City's List would not be required to submit proof of their incarceration in DOC custody, payment of bail, or delay in release; they would be required only to sign an attestation contained in the claim form that they reasonably believed their release may have been delayed at least 3 hours after their bail was paid. *Id*.

Further, as detailed below, Class Counsel negotiated with Defendant to limit the liens deducted from Class Members' monetary awards; secured the right of deceased Class Members to receive a settlement award through their estates' legal representatives; obtained funding from the City to provide Class Members with counseling on how a settlement award might affect their receipt of public benefits; established a process for Class Members to file claims for a significant period of time after the bar date had passed upon a showing of good cause, interpreted permissively; and ensured that uncashed checks would escheat and be available for Class Members to obtain later as unclaimed funds, instead of reverting to the City. *Id*. ¶¶ 27-30; *infra* Part II.B.1.

Class Counsel placed immense importance on the manner, content, and extent of notice to Class Members and negotiated accordingly. *Id.* ¶ 29. In particular, several terms of the

Settlement are calculated to locate Class Members.  Individuals incarcerated by the City are

generally poorer, less likely to maintain stable residences and contact information, and may have

been released from DOC several years ago, so intensive notice efforts were crucial for the

Settlement to be successful in reaching Class Members. Those terms include (a) the City

providing the Administrator with address and email information maintained by three other City

agencies for Class Members; (b) the City paying the Administrator to perform comprehensive

individualized address research to locate Class Members, at a higher cost; (c) the City identifying

sureties (those who paid a Class Member's bail) so that sureties would receive notice if a Class

Member did not file a claim; (d) the City supporting Plaintiffs' efforts to obtain Class Member

data from DOCCS; (e) the Administrator encouraging claimants to tell friends and family about

the Settlement; (f) the City agreeing to post notices in places Class Members or those in their

community may see them, including in DOC facilities, in NYC Human Resources

Administration offices, in NYC Administration for Children's Services offices, and in NYC

Department of Probation's adult supervision offices; (g) the City agreeing to pay up to

$1,050,000  for a multilingual advertising campaign online, in newspapers, on television and

radio, and at fixed locations around the City. *Id*. Class Counsel believe that many of these

administration and notice procedures have not been done in prior civil rights settlements with the

City; Plaintiffs negotiated for these innovations to locate this hard-to-locate class and facilitate

their participation in the settlement. *Id.*

Class Counsel's successful pursuit of up-to-date contact information for Class Members

who are or have been incarcerated in State custody from DOCCS and the New York State Office

of Information Technology ("ITS") through motion practice before Judge Moses prior to the

conclusion of settlement negotiations complemented and supplemented the contact information

for Class Members obtained through other sources. *Id.* ¶¶ 38-39.

Only after the $3,500 award amount had been agreed upon did Class Counsel negotiate the attorneys' fees and costs provision of the Settlement and the $20,000 service awards for each of the Named Plaintiffs. *Id.* ¶ 30.

After reaching agreement on a non-binding term sheet in April 2022, the Parties participated in a settlement conference before Judge Moses regarding several substantive issues and unresolved terms of the Settlement Agreement. *Id.* ¶ 36. After further negotiation, the Parties ultimately reached an agreement on all terms of the agreement, which was executed on October 21, 2022. *See* ECF No. 175-1. The Court preliminarily approved the Settlement on December 1, 2022. *See* ECF No. 179.

### D.     The Notice Program and Claims Process

Rust Consulting was appointed by the Court as the Administrator in the preliminary approval order. *See* ECF No. 179 at ¶ 10. Rust undertook a robust notice program, including direct and publication notice. *See* Declaration of Tiffaney Janowicz ("Janowicz Decl.") at ¶¶ 6-43. Rust implemented to implement the notice program and claims process to ensure simplicity and efficiency, and worked with Class Counsel to review multiple drafts of the direct notice (initial and reminder notice), claim form (hard-copy and online), press release, advertisements in newspapers, magazines, bus shelters, transit stations, subway cars, radio, television, and online advertising. *Id.* ¶¶ 8; Greenberger Decl. ¶¶ 72-76. Rust worked together with the parties to collect, merge, and identify the best address match for each Class Member. Janowicz Decl. ¶¶ 11-12; Greenberger Decl. ¶ 77. For the first and second media "waves," Rust selected, together with Class Counsel, the locations where Class Members would be most likely to see outdoor advertising; selected appropriate television and radio stations; finalized and launched internet and social media advertising; and received information from Class Counsel on the methods of

10

notice were being seen by Class Members in order to select and hire organizations that would disseminate the summary notice as flyers in the community. Janowicz Decl. ¶¶ 19-27; Greenberger Decl. ¶ 76. Rust launched a website, toll-free number with live customer service representatives during business hours, and after-hours interactive pre-recorded messages, all to deliver information to Class Members, offer a way to request claim forms, and (on the website) permit online claims filing. Janowicz Decl. ¶¶ 43-46; Greenberger Decl. ¶ 75.

Alongside Rust's notice program, Class Counsel conducted a robust public outreach campaign to ensure that Class Members learned of the Settlement. Class Counsel obtained earned media coverage (at no cost to the Class) in various national and local publications at the time of motion for preliminary approval, and also appeared on two radio programs to educate listeners about the Settlement—both efforts also served to assure Class Members that the Settlement was legitimate. Greenberger Decl. ¶ 80. Class Counsel contacted approximately a dozen organizations providing criminal defense trial and appellate representation, and consistent with paragraph 68 of the Settlement, provided certain organizations with data about their own clients on the City's List in order to facilitate notice. *Id.* ¶ 81. Class Counsel made dozens of presentations by email, telephone, video, and in-person to social service, legal, educational, reentry, and other organizations that have contact with individuals involved in the criminal justice system. *Id.* ¶ 82. At the request of Class Counsel, the Office of Court Administration agreed to post a version of the summary notice in courthouses in New York City, per the Settlement Agreement. *See id.* ¶ 86 & Ex. 5; Settlement Agreement ¶ 58.

Rust and Class Counsel have responded to questions through a variety of mail, email, and telephone inquiries. Janowicz Decl. ¶¶ 44-46; Greenberger Decl. ¶ 95. As Administrator, Rust will continue to work with the Parties on settlement administration issues in the coming months,

including the deduction of any liens asserted; the issuance and re-issuance of checks to Class

Members; receiving, reviewing, and processing untimely claims; receiving and reviewing

information requested from Class Members who have submitted deficient claims; receiving and

reviewing information from individuals who assert they are Class Members.  Settlement

Agreement ¶¶ 75, 97, 102-103; Greenberger Decl. ¶ 97.

## II.   THE PROPOSED SETTLEMENT AGREEMENT

### A.   The Settlement Class

The Settlement defines the Settlement Class as: All people who were: (a) in the Custody

of DOC; (b) were on at least one occasion released from DOC Custody upon payment of Bail

during the Class Period; and (c) had a delay in their release from Custody after Bail had been

paid. Settlement Agreement ¶ 50. The "Class Period" is October 4, 2014 to October 21, 2022. *Id.*

¶¶ 10, 22.

### B.   Monetary Relief for the Settlement Class

#### 1.   Monetary Benefits

The Settlement obligates the City to pay: (1) an individual settlement award to each Class

Member who submits a valid claim in the amount of $3,500 multiplied by the number of times

the Class Member was released on bail from DOC custody during the Class Period (the "Award

Amount"); the "Claimant Total" is the total amount of funds to be paid to all Class Members

who submit valid claims, which will be calculated by multiplying $3,500 by the total number of

Instances of Release of Class Member who make valid claims; (2) $1,091,388 for administrative

costs and the costs of direct notice to Class Members, including $423,000 for benefits counseling

for Class Members, paid directly to the Administrator and paid separately from the awards to

Class Members; (3) $700,000 for a ten-week initial "wave" of publication and media notice,

followed by up to $350,000 for a second "wave" of such notice; (4) attorneys' fees and costs,

upon award by the Court, separate and apart from the settlement awards payable to Class Members; and (5) service awards to the Named Plaintiffs for $20,000 each. *See* Settlement Agreement ¶¶ 11, 22, 80-86, 90, 92, 94-95 & Appendix A at 1.

The Claimant Total as of June 23, 2023 is $141,256,500. Janowicz Decl. ¶ 47(a). The City has paid Rust the full amount of $1,091,388 for administrative costs and costs of direct notice. *Id.* ¶ 57. The City has also paid Rust $700,000 for the first media "wave," and $288,313 for the second media "wave." *Id.*

Not later than 21 business days after the Final Approval Order becomes final,[2] the City must deposit the Claimant Total with the Administrator. *See* Settlement Agreement ¶¶ 30, 93. The Administrator will issue checks for the Award Amounts, and if a check is returned as undeliverable, the Administrator will search for a new or better address, and remail the check. *Id.* ¶ 102. Any uncashed checks will not revert to the City but will be deemed unclaimed funds of the Class Member, escheat, and deposited in state unclaimed funds accounts so that it remains available for the Class Member to obtain. *Id.* ¶ 103.

### 2. Other Non-Monetary Settlement Terms

The Settlement provides Class Members with significant non-monetary benefits, including a simple and non-burdensome claims process. Individuals are eligible for a settlement award if they submit a valid claim containing their name and date of birth, they sign an

---

[2] The Final Approval Order will become final (a) if no objector has lodged a timely objection, on the date of entry of the Final Approval Order, or (b) if an objector has lodged a timely objection, when the time for that objector to appeal has expired or, if the objector has appealed from the Final Approval Order or any portion thereof, on the date when the appeal results in the affirmance of the Court's Final Approval Order of this Agreement. Settlement Agreement ¶ 30.

attestation confirming that they reasonably believe that it may have taken at least three hours after their bail was paid before they were released from custody, and their name appears on the Class List. Settlement Agreement ¶ 10. They may sign the attestation even if they do not know when their bail was paid or when they were released. *Id.* ¶ 92. So long as a Class Member is on the City's Class List, they are not required to submit proof that they were in DOC custody, the length of their incarceration, or the length of their over-detention. Greenberger Decl. ¶ 55.

Further, the Settlement establishes that the only liens that *must* be deducted from the Award Amount are New York child support liens (with the City providing prior notice to that Plaintiff that they are the subject of a child support lien). The Parties will work in good faith to *not* have the City's Department of Finance ("DOF") assert any city liens or judgments against any Award Amount. The only city liens that may be deducted are docketed parking judgments up to a maximum of $500 from the Award Amount. Settlement Agreement ¶ 76.

The Settlement also offers Class Members significant time to submit "untimely" claims after the bar date—up to three months after the City deposits the Claimant Total with the Administrator, which means that Class Members who only learn of the Settlement after a friend or neighbor receives the Settlement check can submit a claim during the untimely claims period. *Id.* ¶ 97. Untimely claims must be supported by good cause, which can include illness or death of a Class Member or their family, incarceration or detention, problems with receiving or sending claim forms, technical difficulties, and any other kind of barrier to filing a claim. *Id.* Class Members do not have to submit a written explanation for good cause or submit documentary evidence. *Id.* Applying a permissive standard, the Administrator's finding that a Class Member has established good cause is final and non-reviewable; if the Administrator does not initially find good cause, it will consult with the Parties before reaching final determination, and the

14

Class Member is entitled to seek *de novo* review by the Court of denial of their untimely claim. *Id.*

The Settlement also provides benefits for deceased class members who would have been eligible for the settlement award: the duly appointed legal representative of a Class Member's estate may sign an attestation and file a claim, together with a death certificate for the Class Member and proof of their status as legal representative. *Id.* ¶ 100. While James Lynch, a former Named Plaintiff, died during the pendency of this suit, his estate's legal representative may file a claim for the settlement award to which Mr. Lynch would have been entitled. *Id.* ¶ 101.

Finally, the Settlement provides Class Members, many of whom receive public benefits, the opportunity to call and speak to a government benefits consultant. This service offers Class Members individualized counseling to discuss the effect of any award under the Settlement on their need-based government benefits, explain the options available to protect those benefits before they receive a settlement award, and help preserve their benefits if they choose to do so. *Id.* ¶ 78.

### 3.    Releases

Class Members who do not file valid requests for exclusion from the Settlement Class will be bound by the terms of the Settlement Agreement, including a release of all claims that they have, could have had, or could have against Defendant based on the factual allegations in the Complaint (ECF No. 1), including but not limited to alleging unconstitutional over-detention from a DOC facility after payment of bail during the Class Period. *Id.* ¶¶ 104-105, 120-121.

### C.    Notice to the Class and Their Response

In its preliminary approval order, the Court appointed Rust to administer the Settlement. As detailed in Part I.D *supra* and the Janowicz Declaration, Rust carried out a significant and substantial notice program in accordance with the Preliminary Approval Order. *See* Janowicz

15

Decl. at ¶¶ 6-42. Alongside Rust's notice program, Class Counsel supplemented notice to Class Members through individual, direct messages to over 450 Class Members in state DOCCS custody; speaking with Class Members directly at homeless shelters, NYCHA housing projects, and in jails and prisons; and conducting outreach to organizations that provide social or legal services to Class Members. Greenberger Decl. ¶¶ 81-84.

The deadline for requests for exclusion and objections was June 6, 2023, 175 days after claim packets were mailed. Only 6 Class Members, which represents less than one percent of the Settlement Class, have timely excluded themselves from Settlement. *See* Janowicz Decl. ¶ 48.[3] At most, only two *potential* objections (again far less than one percent of the Settlement Class) have been filed. Janowicz Decl. ¶ 49 & Ex. 7; *see infra* Part III.C.5 (one objection from Frederick Williams and one purported objection on behalf of Estate of S.A.). The scarce number of objections and exclusions underscores both the extraordinary nature of the relief obtained for the Settlement Class and the fairness of the Settlement as a whole.

As of June 23, 2023, 27,478 valid claims, representing 40,539 instances of release, have been received and validated from Class Members. Janowicz Decl. ¶ 47(a). This represents 38% percent of the total number of individual Class Members (approximately 72,377), and 43% of the total number of instances of release during the Class Period.[4] *Id.* This is an extraordinary and

---

[3] One of the exclusions was received after the June 6, 2023 deadline, but the Parties have agreed to accept it and exclude the individual from the Settlement Class. *See* Janowicz Decl. ¶ 48.

[4] After the City provided the class list, Rust calculated the number of class members as 72,377. The preliminary approval motion referenced a class size of 71,855 based on figures provided by DOC before the City's class list was produced.

near-unprecedented return, exceeding by far the average claims rate in class action settlements. *See Hernandez v. Immortal Rise, Inc.*, 306 F.R.D. 91, 100 (E.D.N.Y. 2015) (citing McLaughlin on Class Actions § 6:24 (8th ed.) ("Claims-made settlements typically have a participation rate in the 10–15 percent range."); *Sullivan v. DB Invs., Inc.*, 667 F.3d 273, 329 n.60 (3d Cir. 2011) (*en banc*) (claims rates in class action settlements "rarely" exceed 7%, "even with the most extensive notice campaigns"). Moreover, this number is almost certain to increase with acceptance of untimely claims with good cause and correction of deficient claims.

**D.      Attorneys' Fees and Costs and Service Awards**

The City has agreed to pay Class Counsel the attorneys' fees and costs in the amount awarded by the Court, separate and *in addition to* the amounts provided to pay claims by Class Members. Class Counsel may seek attorneys' fees and costs that are no higher than the *lower* of (a) 10% of the Potential Benefit to the Class, or (b) 25% of the Actual Benefit to the Class. Settlement Agreement ¶ 79. The "Potential Benefit to the Class" is calculated as the total of attorneys' fees and expenses, Administrative Costs, class representative service awards, and $3,500 times the number of Instances of Release in the Class Period. *Id.* ¶ 39. "Actual Benefit to the Class" is currently calculated as the total of attorneys' fees and expenses, Administrative Costs, class representative service awards, and $3,500 times the number of claimed instances of release actually received by the Administrator. *Id.* ¶ 7. Class Counsel may seek fees that are lower than these amounts, while the City reserves the right to respond to the attorneys' fees application, including that Class Counsel's fees should not be awarded based on a percentage of the Actual/Potential Benefit and should instead be assessed and awarded based on a lodestar calculation, with the possibility of an additional multiplier, given the nature of the Settlement Agreement. *Id.* ¶ 79. The Court granted the Parties' joint application to extend until July 31,

2023 the time for Plaintiffs' to seek approval and an award of attorneys' fees and costs. *See* ECF No. 189. Resolution of Class Counsel's application for attorneys' fees and costs, including any appeals of orders relating to attorneys' fees and costs, shall not delay the final approval of agreement and shall not delay the payments to Class Members, administrative costs, or class representative service awards. Settlement Agreement ¶¶ 30, 79.

The Parties have also agreed—subject to Court approval—that each of the Named Plaintiffs will receive a twenty-thousand-dollar ($20,000) service award for their efforts and time devoted on behalf of the Settlement Class. *Id.* ¶ 90.

## III. THE PROPOSED SETTLEMENT IS FAIR, REASONABLE AND ADEQUATE, AND SHOULD BE APPROVED IN ALL RESPECTS

The law favors compromise and settlement of class action suits. *Wal-Mart Stores, Inc. v. Visa U.S.A., Inc*., 396 F.3d 96, 116 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged.").[5] "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472, 2012 WL 5862749, at *2 (S.D.N.Y. Nov. 15, 2012); *see also Diaz v. E. Locating Serv., Inc.*, No. 10 Civ. 4082, 2010 WL 5507912, at *3 (S.D.N.Y. Nov. 29, 2010) (giving "weight to the parties' judgment that the settlement is fair and reasonable").

Final approval of a settlement is contingent on a finding that the settlement is "fair,

---

[5] All citations have been "cleaned up."

reasonable, and adequate." Fed. R. Civ. P. 23(e)(2), requiring a review of both procedural and substantive fairness. Rule 23(e)(2), as amended on December 1, 2018, instructs the Court to determine whether the Settlement is "fair, reasonable, and adequate" after considering: (1) adequacy of representation, (2) existence of arm's-length negotiations, (3) adequacy of relief, and (4) equitableness of treatment of class members. Fed. R. Civ. P. 23(e)(2). Prior to the 2018 amendments, courts in the Second Circuit have long considered whether a settlement was "fair, reasonable, and adequate" under the nine factors set out in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974).[6] *See Nichols v. Noom, Inc.*, No. 20 Civ. 3677 (KHP), 2022 WL 2705354, at *7 (S.D.N.Y. July 12, 2022). The 2018 amendments to Rule 23 did not displace any of the *Grinnell* factors, so the assessment of the assessment under Rule 23(e) continues to be guided and informed by those factors. *See id.*; *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019); *Gordon v. Vanda Pharm. Inc.*, No. 19 Civ. 1108, 2022 WL 4296092, at *3. Thus, the *Grinnell* factors are addressed where relevant below.

### A.    Adequacy of Representation

Class Counsel and the Named Plaintiffs, in litigating and securing a Settlement with significant and meaningful monetary and non-monetary terms (resulting in an extraordinary

---

[6] The *Grinnell* factors are (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation. *Grinnell*, 495 F.2d at 463.

number of claims by Class Members and overall settlement award) have provided "adequate representation" to the class required by Rule 23(e)(2)(A). In determining the adequacy of class representatives and counsel, courts consider "whether (1) plaintiff's interests are antagonistic to the interest[s] of other members of the class and (2) plaintiff's attorneys are qualified, experienced and able to conduct the litigation." *Cordes & Co. Fin. Servs., Inc. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007); *Mikhlin v. Oasmia Pharm. AB*, No. 19 Civ. 4349, 2021 WL 1259559, at *4 (E.D.N.Y. Jan. 6, 2021).

Named Plaintiffs Jones and Spencer have common interests with other members of the class, and no interests that are antagonistic to the other class members. They suffered the same "general injury as the rest of the class"—over-detention caused by DOC's delay in releasing them after they posted bail and were entitled to release. They sought the same relief as the other class members, namely, damages for the length of their over-detention. ECF No. 1 ¶¶ 119(g), 132, 138. Given their common injuries and the common remedies sought, the Named Plaintiffs have an "interest in vigorously pursuing the claims of the class." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 692.

Further, Class Counsel are qualified, experienced, and able to conduct this litigation, assess the strengths and weaknesses of the case, and negotiate settlement. After defeating the City's motion to dismiss, Class Counsel engaged in hard-fought discovery battles over the course of three years to obtain hundreds of thousands of pages of electronic and hard copy data, fact witness depositions, and third-party discovery, even during the onset of the COVID-19 pandemic. Greenberger Decl. ¶¶ 10-20. Class Counsel then transcribed, analyzed, and merged the data sets to create a comprehensive assessment of the nature and length of Class Members' over-detention in DOC custody, in order to develop and support the strongest possible evidence

to support either a trial on the merits or an effective position for settlement negotiations. *Id.* ¶ 22. The Settlement itself was the product of Class Counsel's commitment to over 18 months of settlement negotiations to secure not only a significant monetary award to individual Class Members, but also a robust notice program paid for by the City separately from the Class Members' settlement awards; a simplified claims process; a limitation on reduction of settlement awards for liens; government benefits counseling; an untimely claims process with a permissive standard for showing good cause; uncashed checks will escheat and be available as unclaimed funds to the Class Member instead of reverting to the City; the right of deceased Class Members to receive a settlement award; and the City's agreement to pay attorneys' fees and costs separately from the Class Members' settlement awards. *Id.* ¶¶ 26-30. Many of these Settlement terms are believed to be the first-of-their-kind in a civil rights class action settlement with the City, further underscoring the skill with which Class Counsel represented the class. *Id.* ¶ 29.

Class Counsel drew from their substantial expertise in civil rights and class action litigation, which has been recognized by numerous courts.[7] In *Wise v. Kelly*, 620 F. Supp. 2d 435, 445 (S.D.N.Y. 2008), the court took "judicial notice of [ECBAWM]'s high reputation . . . finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this Court." In *Harvey v. Home Savers Consulting Corporation,* No. 07 Civ 2645 (JG), 2011

---

[7] Prior to becoming a partner at ECBAWM in 2023, Julia P. Kuan was a member of Romano & Kuan PLLC, where she also represented Plaintiffs in this case. The Court appointed Romano & Kuan PLLC as Class Counsel in its preliminary approval order, *see* ECF No. 179 at ¶ 7, and later granted the application to have Romano & Kuan PLLC withdrawn as class counsel after Ms. Kuan joined ECBAWM as a partner. *See* ECF No. 185.

WL 4377839, at *4 (E.D.N.Y. Aug. 12, 2011), the court stated that it had "taken into account the excellent reputation of [ECBAWM] among attorneys specializing in civil rights cases," and in *Vilkhu v. City of New York*, No. 06 Civ. 2095 (CPS), 2009 WL 1851019, at *3 (E.D.N.Y. June 26, 2009), *vacated on other grounds by* 372 F. App'x 222 (2d Cir. 2010), the court noted ECBAWM's exceptional "collective experience [and] success rate." *See also Rosenfeld v. Lenich*, No. 18 Civ. 6720 (NGG) (PK), 2021 WL 508339, at *5 (E.D.N.Y. Feb. 11, 2021) (describing ECBAWM as "well regarded and highly capable"); *Scott v. Quay*, 338 F.R.D. 178, 189 (E.D.N.Y. 2021) (finding ECBAWM to have a "wealth of experience handling complex class actions"); *Betances v. Fischer*, 304 F.R.D. 416, 428 (S.D.N.Y. 2015) (ECBAWM is a "preeminent' civil rights firm" ); *Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds*, 609 F.3d 467 (2d Cir. 2010) (same).

KLLF also possesses broad and deep expertise in complex federal civil rights litigation, and currently represents several putative classes in civil rights actions pending in federal courts across New York State. *See Sierra v. City of New York*, No. 20 Civ. 10291 (S.D.N.Y.) (putative class action alleging constitutional violations by the NYPD against demonstrators protesting in the Bronx against police brutality in the wake of George Floyd's murder); *Caballero v. N.Y.S. Dep't of Corr. & Comm'ty Supervision*, No. 20 Civ. 1470 (N.D.N.Y.) (putative class action alleging that the New York State Department of Corrections and Community Supervision unlawfully barred prisoners with disabilities from accessing an early release program); *Yeend v. Akima Global Servs., LLC*, No. 20 Civ. 1281 (N.D.N.Y.) (putative class action alleging human trafficking claims and forced labor practices by a corporation contracted to operate a civil immigration detention facility). David Lebowitz, a KLLF partner, is a former ECBAWM attorney who has represented the putative class since this case was filed.

###### B.    Arm's Length Negotiations

The Settlement meets the requirement of procedural fairness under Rule 23(e)(2)(B) because "the proposal was negotiated at arm's length." In evaluating procedural fairness, the court must examine "the negotiating process leading up to settlement" in order to "ensure that the settlement resulted from arm's-length negotiations and that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *Wal-Mart Stores*, 396 F.3d at 116; *see D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery." *Wal-Mart Stores*, 396 F.3d at 116.

Here, negotiations between the Parties were lengthy, complex, vigorously contested, and always conducted at arm's length. The Parties engaged in extensive discovery, including document discovery, depositions, and third-party subpoenas seeking the relevant policies, practices, and directives of DOC; policies, practices, and training documents relating to DOC's record-keeping and electronic database management systems; and electronic and hard copy data maintained by DOC regarding the movement of incarcerated individuals. Greenberger Decl. ¶¶ 10-19. Having carefully examined DOC's data-keeping practices, and the data that existed on the nature and length of Class Members' over-detention, the Parties understood the strengths and weakness of each other's positions. *Id.* ¶ 10-19, 22.

The Parties—who were represented by experienced, highly capable counsel—engaged in more than 21 months of protracted settlement negotiations among themselves, and participated in a settlement conference before Magistrate Judge Barbara Jones to resolve key settlement terms. *Cf. D'Amato*, 236 F.3d at 85 ("[A] court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue

pressure."); *Lea v. Tal Educ. Grp.*, No. 18 Civ. 5480 (KHP), 2021 WL 5578665, at *8 (S.D.N.Y.

Nov. 30, 2021) (same). The Parties exchanged multiple draft settlement proposals, discussing

terms in detail by telephone conference and email, and negotiating over issues such as the

amount of class member's monetary settlement award, the structure and timing of payment of

individual awards, the reduction of awards by child support liens and docketed parking

judgments, the scope and method of class notice, the amount Defendant would pay to fund class

notice, providing counseling to class members regarding the impact of the award on their public

benefits, obtaining address and email information for class members from City agencies, and

many other issues. Greenberger Decl. ¶¶ 21-37. The Parties' "vigorous" litigation of the case and

the settlement terms demonstrates their lack of collusion. *Gordon,* 2022 WL 4296092, at *4.

Because the settlement process here was fair, arms-length and collusion-free, the

resulting agreement is presumed to be fair, adequate, and reasonable.

### C.     Adequacy of Relief

Rule 23(e)(2)(C) requires examining whether relief for the class is adequate, taking into

account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed

method of distributing relief to the class, including the method of processing class-member

claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of

payment; and (iv) any agreement required to be identified under Rule 23(e)(3). *In re GSE Bonds*

*Antitrust Litig.*, No. 19 Civ. 1704 (JSR), 2019 WL 6842332, at *2 (S.D.N.Y. Dec. 16, 2019).

### 1.     Costs, Risk, Delay of Trial and Appeal

By reaching a favorable settlement prior to dispositive motions or trial, Plaintiffs seek to

avoid significant expense, risk, and delay and ensure recovery for the class. "Most class actions

are inherently complex and settlement avoids the costs, delays and multitude of other problems

associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174

(S.D.N.Y. 2000), *aff'd sub nom. D'Amato v. Deutsche Bank*, 236 F.3d 78.

This case is no exception. With a class period dating back to 2014 and significant amounts of relevant electronic and hard copy data requiring analysis, this case is extraordinarily complex. Further litigation here would cause additional expense and delay. Though the case has been pending since October 2017, Plaintiffs have yet to depose certain key witnesses from among the Defendant, Defendant has not conducted depositions, and discovery is far from complete. Defendant has yet to provide certain electronic and hard copy records demonstrating the movement of individuals in DOC custody, which could reveal more information about the length of over-detention after Class Members paid bail. Greenberger Decl. ¶¶ 10-19, 22, 58.

Even once discovery were to be completed, the Parties envision summary judgment and class certification motions raising many technical and novel issues of law, such as whether the length of their over-detention violates the Constitution, proving the length of over-detention, and whether Defendant would challenge the suitability of class certification under Federal Rule of Civil Procedure 23, such as by arguing too many individual issues exist to maintain the class. While Plaintiffs believe the class would be certified and summary judgment denied, both motions present significant risks to the class. *Id*. ¶ 59.

If Plaintiffs succeed on certifying the class and defeating summary judgment, a fact-intensive trial would likely be necessary to determine both liability and damages. A trial on the merits would involve significant risks for Plaintiffs as to both liability and damages. A trial would be lengthy and complex. While Plaintiffs believe that they could ultimately establish both liability and damages, this would require significant factual development, requiring hundreds of additional hours of discovery, plus the time and resources required to litigate dispositive motions and prevail at trial, and then prevail again on the inevitable appeal. *Id*. ¶ 60. Class members

would not obtain relief for years. The settlement, on the other hand, makes monetary relief available to class members in a prompt and efficient manner. *Lea*, 2021 WL 5578665, at *9 (preliminary approval appropriate where it brought to a close litigation "that could have lasted several more years and cost hundreds of thousands of dollars in attorneys' fees and expenses and brings immediate relief to the class").

Further, although Plaintiffs believe their case is strong, it is subject to considerable risk, including the risk of obtaining and maintaining class certification through trial. "Litigation inherently involves risks." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997). Defendant could defeat class certification, win a dispositive pre-trial motion, or obtain favorable verdict at trial—in those situations Class Members would be left with no relief at all. Even if Plaintiffs win a favorable verdict and an award of damages, the verdict or damages award could be reversed or reduced on appeal. In contrast, "[t]he proposed settlement benefits each plaintiff in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial." *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007).

Class Counsel are experienced and realistic, and understand that the resolution of liability issues, the outcome of the trial, and the inevitable appeals process are inherently uncertain in terms of outcome and duration. The proposed settlement alleviates these uncertainties. Therefore, Rule 23(e)(2)(C)(i), the first *Grinnell* factor (the complexity, expense, and likely duration of the litigation), the fourth *Grinnell* factor (the risks of establishing liability), the fifth *Grinnell* factor (the risks of establishing damages), and the sixth *Grinnell* factor (the risks of maintaining the class action through the trial) all weigh in favor of approval.

## 2.    Effectiveness of the Proposed Method of Distributing Relief

Rule 23(e)(2)(C)(ii) requires courts to examine "the effectiveness of any proposed

26

method of distributing relief to the class, including the method of processing class-member claims." While the claims processing method "should deter or defeat unjustified claims, but the court should be alert to whether the claims process is unduly demanding." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair and adequate.... [a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *In re Payment Card*, 330 F.R.D. at 40 (citing *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)); *see also In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014) ("When formulated by competent and experienced class counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis.").

The extraordinary number of validated claims by Class Members—38% of the class—demonstrates that Class Members have found the claims process to be simple and nonburdensome. In devising the claims process, the Administrator and Class Counsel have used well-established, effective procedures for receiving, processing, and validating claims: permitting claim filing online and by mail in English and Spanish (with other languages available upon request); permitting any individual to submit a claim for review and potential validation; jointly reviewing the claim verification process; and drafting and issuing simple and easy to understand letters to claimants that requested further information in order to process the claim. *See* Janowicz Decl. ¶¶ 43-46; Greenberger Decl. ¶¶ 91-92, 94; *Lea,* 2021 WL 5578665, at *11. Class Members are not required to provide proof of their time in DOC custody or the length of their over-detention; they need only sign an attestation confirming their presence in DOC

custody and delayed release on bail, and are presumptively eligible if they appear on the City's Class List. Greenberger Decl. ¶ 26. For "untimely" claims filed after the bar date, Rust and Class Counsel have adopted the same online and mail claim filing process and simply updated the claim form to include checkboxes allowing Class Members to select why their claim is untimely. Janowicz Decl. ¶ 47(g); Greenberger Decl. ¶ 94.

Moreover, the settlement allocation is straightforward: each Class Member's Award Amount consists of $3,500 multiplied by their Instances of Release during the Class Period. Each Instance of Release is awarded the same amount of money. The Settlement Agreement recognizes deceased Class Members' rights to recovery. Settlement Agreement ¶ 100. The estates of deceased class members, acting through their duly-appointed legal representatives, receive an Award Amount calculated in the same way. *Id.* ¶ 100. Class Members who submit "untimely" claims after the bar date, provided they meet the permissive standard for good cause, also receive an Award Amount calculated this way. *Id.* ¶¶ 96-97. Assuming final approval is granted, the Administrator will distribute checks in the Award Amount to Class Members who have submitted valid claims. *Id.* at ¶ 93. If those checks are returned to the Administrator, the Administrator will conduct additional address searches, reissue and resend checks. *Id.* ¶ 102. If the checks remain uncashed, they will escheat so that the Class Member may seek the funds later. *Id.* ¶ 103.

Because there is no limit on the Claimant Total, the Award Amount will not be reduced by the number of claims submitted by Class Members. Nor will the Award Amount be reduced by costs of settlement administration, notice to the class, attorneys' fees and costs, or potential service awards to the Named Plaintiffs, as the City has agreed to pay these latter amounts separately. *Id.* ¶¶ 79, 80-81, 90.

### 3.    The Terms of Any Proposed Award of Attorneys' Fees and Expenses

Rule 23(e)(2)(E)(iii) requires courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment." Here, Class Counsel's attorneys' fees and costs will not be deducted from the Class Members' Award Amounts. Instead, Defendant has agreed to pay Class Counsel's attorneys' fees and costs separately from the Award Amounts being paid to Class Members.

These terms, therefore, mean that "[w]hatever attorneys' fees are awarded . . . will in no way diminish the benefit to the class under the settlement." *Dupler v. Costco Wholesale Corp.*, 705 F. Supp. 2d 231, 243 (E.D.N.Y. 2010). Where "money paid to the attorneys is entirely independent of money awarded to the class, the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members." *Schwartz v. Intimacy in New York, LLC*, No. 13 CV 5735 (PGG), 2015 WL 13630777, at *6–7 (S.D.N.Y. Sept. 16, 2015) (quoting *McBean v. City of New York*, 233 F.R.D. 377, 392 (S.D.N.Y. 2006)).

The fact that the Parties are attempting to settle attorneys' fees and costs should not prevent final approval of the Settlement now. Whether the Parties reach settlement or not, the Court will retain its role in reviewing and approving an award of attorneys' fees and costs as fair and reasonable. That award is capped at the lower of (a) 10% of the Potential Benefit to the Class, or (b) 25% of the Actual Benefit to the Class, though Class Counsel may seek a lower amount. Settlement Agreement ¶ 79. Further, the City has reserved the right to respond to the attorneys' fees application, including that Class Counsel's fees should not be awarded based on a percentage of the Actual/Potential Benefit and should instead be assessed and awarded based on a lodestar calculation, with the possibility of an additional multiplier, given the nature of the Settlement Agreement. *Id.* Under these circumstances, where the Court will later review and

order the City to pay Plaintiffs' attorneys' fees and costs up to a cap that has been clearly laid out in the Settlement, the Court may grant final approval of the Settlement.

### 4.    Any Agreement Required to be Identified Under Rule 23€(3)

Rule 23(e)(2)(C)(iv) requires courts to consider "any agreement required to be identified by Rule 23(e)(3)," that is, "any agreement made in connection with the proposal." The Parties have not entered into any agreements other than the Settlement Agreement that has been submitted for approval.[8] Accordingly, this factor poses no obstacle to preliminary approval. *Rosenfeld,* 2021 WL 508339, at *7.

### 5.    Reaction of the Class to the Settlement: Objections and Exclusions

The second *Grinnell* factor—the reaction of the class to the settlement—favors final approval because of the miniscule number of exclusion requests and objections and the substantial number of class members who filed claims. *See Tiro v. Pub. House Invs., LLC*, Nos. 11 Civ. 7679(CM), 11 Civ. 8249(CM), 2013 WL 4830949, at *7 (S.D.N.Y. Sept. 10, 2013) ("Where relatively few class members opt-out or object to the settlement, the lack of opposition supports court approval of the settlement."); *Wal-Mart Stores, Inc.*, 396 F.3d at 118 (concluding that only 18 objections from a class of five million was indicative of the adequacy of the settlement); *D'Amato*, 236 F.3d at 86-87 (holding that the district court properly concluded that 18 objections from a class of 27,883 weighed in favor of settlement approval); *Morris v. Affinity Health Plan, Inc.*, 859 F. Supp. 2d 611, 619 (S.D.N.Y. 2012) (finding that where 16 out of 1500 class members requested exclusion from the settlement, the "response demonstrate[d] strong

---

[8] The Parties' April 14, 2022 Term Sheet was non-binding and thus not an "agreement made in connection with the proposal."

support for the settlement.").

Only six requests for exclusion have been filed by Class Members. Janowicz Decl. ¶ 48. That represents far less than a single percent of the overall class and is dwarfed by 38% of the class that have filed valid claims. *See Sykes v. Harris*, No. 09 Civ. 8486 (DC), 2016 WL 3030156, at *12 (S.D.N.Y. May 24, 2016) (finding positive reaction of class demonstrated by fact that only 38 out of 215,000 class members submitted exclusion requests).

As for objections, as of June 6, 2023, only one objection has been filed; additionally, a second potential objection has been filed by someone purporting to act on behalf of a class member without establishing his authority to do so.[9] Janowicz Decl. ¶ 49.

### a. Frederick Williams

Class Member Frederick Williams filed a timely objection to the Settlement on the basis that the Award Amount—$3,500—was insufficient to compensate him based on his unique circumstances. *See* Janowicz Decl. Ex. 8; Greenberger Decl. Ex. 3; ECF Nos. 186, 191, 192. Mr. Williams has alleged that because of what happened to him in jail while he was overdetained, he suffered more severe harm than other Class Members did—allegations that have not been proven—so he should receive additional compensation for those individual circumstances.[10] He also claims (incorrectly) that Class Counsel will receive $87 million in attorneys' fees and

---

[9] Another potential "objection" was filed by Robert Jones. *See* ECF No. 180. Mr. Jones has since notified Rust that he is withdrawing his objection to the settlement. Janowicz Decl. ¶ 50.

[10] Mr. Williams also stated that Class Counsel opposed his appearance at the Fairness Hearing. *See* ECF No. 192 (referring to sealed letter). This is incorrect. Class Counsel informed the Court on June 16, 2023 that it does not oppose Mr. Williams' request to appear at the Fairness Hearing. *See* ECF No. 190 at 1.

objects to this amount. Neither of these objections have merit.

*First*, as the Court has acknowledged, Mr. Williams's alleged treatment by other incarcerated people and DOC officers are individual claims appropriate for a separate lawsuit. *See* ECF No. 191. Courts have recognized that "[o]bjections based purely upon individual claims of loss do not warrant disapproval of the proposed settlement." *Thacker v. Chesapeake Appalachia, L.L.C.*, 695 F. Supp. 2d 521, 528 (E.D. Ky. 2010), *aff'd sub nom. Poplar Creek Dev. Co. v. Chesapeake Appalachia, L.L.C.*, 636 F.3d 235 (6th Cir. 2011) (quoting *EEOC v. McDonnell Douglas Corp.,* 894 F. Supp. 1329, 1335 (E.D.Mo.1995)) (rejecting objections involving allegations that defendants engaged in bad acts falling outside scope of the lawsuit); *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, No. 3:08-MD-01998, 2010 WL 3341200, at *7 (W.D. Ky. Aug. 23, 2010) (same). Mr. Williams retains the right to pursue his own lawsuit for claims not released by this lawsuit.

*Second*, Mr. Williams' contention that he is entitled to more than $3,500 for his individual injuries does not undermine the overall fairness and reasonableness of the Settlement. Class action settlements may result in monetary awards "less than what some class members feel they deserve," but this is "precisely the stuff from which negotiated settlements are made." *Officers for Just. v. Civ. Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 628 (9th Cir. 1982); *In re Oil Spill by Oil Rig Deepwater Horizon*, 910 F. Supp. 2d 891, 941 (E.D. La. 2012), *aff'd sub nom. In re Deepwater Horizon*, 739 F.3d 790 (5th Cir. 2014) ("Settlements are compromises, and the fact that some class members wish BP had paid more compensation is no reason to reject the Settlement."). The relevant question is "whether the terms of the settlement as a whole are fair and reasonable, and not whether every member of the class is fully compensated." *In re Nissan Radiator/Transmission Cooler Litig.*, No. 10 CV 7493, 2013 WL

4080946, at *11 (S.D.N.Y. May 30, 2013). Here, Class Members have each received $3,500—a meaningful amount of money—for each Instance of Release during the Class Period. The Settlement "aims to resolve claims on an aggregate basis to provide the greatest total recovery for the greatest number of people and was negotiated in light of the complexities that exist." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d 456, 492 (E.D. La. 2020) (rejecting objections that class action settlement did not provide objectors sufficient money to make them whole for injuries). Further, whatever amount Mr. Williams may be "missing in terms of dollars [he makes] up for by guaranteed recovery and an end to" years of litigation. *Id.* If he is dissatisfied with the settlement amount, he has the right to opt out—which, notably, he has not chosen to do. As Mr. Williams himself acknowledges, it can take years for him to pursue a separate federal lawsuit. *See* ECF No. 186, 191 (referencing objection letter sent to Court and being filed under seal). He "recognize[s] the inherent difficulties and uncertainties associated with pursuing this option, and [his] actions suggest that final approval of the Settlement is warranted." *In re Chinese-Manufactured Drywall Prod. Liab. Litig.*, 424 F. Supp. 3d at 492; *Dickerson v. York Int'l Corp.*, No. 1:15-CV-1105, 2017 WL 3601948, at *9 (M.D. Pa. Aug. 22, 2017) (rejecting objection because "[i]f any class member felt they had a stronger damages claim than the rest of the class, they were free to opt out of the settlement class.").

Finally, Mr. Williams's objection to $87 million in attorneys' fees that may be awarded to Class Counsel is based on an incorrect understanding of the Settlement's terms and incomplete knowledge of the Potential Benefit and Actual Benefit to the Class. Mr. Williams incorrectly states that Class Counsel could receive attorneys' fees consisting of 25% of the Potential Benefit to the Class. The Settlement actually provides that Class Counsel may seek only up to 10% of the Potential Benefit to the Class, and up to 25% of the Actual Benefit to the Class—and may seek

33

less. *See* Settlement Agreement at ¶ 79. These percentages are in line with what courts routinely award to class counsel. *See Pearlstein v. BlackBerry Ltd.*, No. 13 Civ. 7060(CM)(KHP), 2022 WL 4554858, at *10 (S.D.N.Y. Sept. 29, 2022) (awarded class counsel fees of 33.3% taken from $55 million settlement)*; Qsberg v. Foot Locker, Inc.*, No. 07 Civ. 1358, ECF No. 423 (S.D.N.Y. June 8, 2018) (awarded class counsel 33% of $288.4 million settlement as attorneys' fees); *In re Platinum & Palladium Commodities Litig.*, No. 10 Civ. 3617, 2015 WL 4560206, at *1 (S.D.N.Y. July 7, 2015) (awarded class counsel 29.5% of $72.5 million settlement fund as attorneys' fees). Next, 25% of the Actual Benefit to the Class is far less than the $87 million figure that Mr. Williams objects to. *See* Janowicz Decl. ¶ 47 (current Claimant Total is $141,256,500). Ultimately, any award of attorneys' fees and costs is subject to Court approval as reasonable under the circumstances and will not be deducted from the amount paid to Claimants. Given the terms of the Settlement and the Court's continuing jurisdiction to review and approve a reasonable award of attorneys' fees and costs, Mr. Williams's objection should be rejected.

### b.    S.A.

The second purported potential objection, filed by an unnamed individual purporting to be the "Executor/Beneficiary" of the "Estate of [Class Member] S.A.," should not be considered an objection as the filer has not established that he can act on the Class Member's behalf (nor was the filer clear he was objecting). See Janowicz Decl. Ex. 8.[11] The correspondence dated April 17, 2023 received by Rust stated it was an "objection" without any details and also asked for three claim forms. *Id*. at 38.

---

[11] The correspondence from the individual purporting to act on behalf of S.A. has been redacted to protect personally identifiable information and other sensitive details. Class Counsel can file the unredacted versions of these exhibits under seal should the Court request.

By letter dated April 25, 2023, Class Counsel sent a claim form to the return address listed on the April 17, 2023 letter and notified the sender of the need to provide documentation of their legal authority to act on behalf of the Estate of S.A. *See* Greenberger Decl. Ex. 4. On May 26, 2023, having not received a response, Class Counsel sent another letter by certified mail, return receipt requested stating that documentation of legal authority to act on behalf of the Estate of S.A. was needed. *Id.* at 2. Rust subsequently received a claim form with the claimant listed "[S.A.] Estate Ex. Rel. [A.S.]" that was signed and dated "5/10/1980." Janowicz Decl. Ex. 8 at 35. Class Counsel received an envelope postmarked June 7, 2023 containing a document entitled "Probate Letter of Appointment of Executor," which was forwarded to Rust and the City. Greenberger Decl. Ex. 4 at 7. On June 21, 2023, Class Counsel sent a letter by certified mail, return receipt requested to a new address emailed to Class Counsel from for the "[S.A.] Estate," stating that the "Probate Letter of Appointment of Executor" was insufficient under the Settlement Agreement to demonstrate that the sender had been appointed a legal representative of the Estate of S.A. *See* Greenberger Decl. Ex. 4 at 9. Rust will also be sending a deficiency letter to the person who submitted the claim requesting a death certificate and proof that the claimant has been appointed the legal representative of the Estate of S.A., as required by the Settlement Agreement. Settlement Agreement ¶ 100.

The purported objection is deficient on its face because it did not comply with the Settlement Agreement's requirements for objectors: it did not list "the specific reason(s), if any, for each such objection," "whether it applies only to the objector, to a specific subset of the Class, or to the entire Class," did not "state with specificity the grounds for the objection, including any legal support the Class Member wishes to bring to the Court's attention and any evidence the Class Member wishes to introduce in support of such objection." Settlement

Agreement ¶ 107; Preliminary Approval Order ¶ 27, ECF No. 179.  Nor did the letter state

whether the filer "wishes to speak at the Fairness Hearing."  Settlement Agreement ¶ 107;

Preliminary Approval Order ¶ 27, ECF No. 179. The letter was also deficient in that it did not

include the filer's name or telephone number.  Settlement Agreement ¶ 108.

These deficiencies are substantive: it is unclear whether the sender actually sought to

object to the Settlement, or merely sought a claim form, and offers no detailed basis for an

objection.

Even if the correspondence is considered an attempt to object, it should be rejected

because it was not established to be sent by a Class Member. Fed. R. Civ. P. 23(e)(5) allows

"[a]ny *class member* [to] object to the [settlement] proposal . . ." (emphasis added). However, it

is well settled that a potential objector "has standing to object to the proposed settlement *only* if

it is part of the [] class." *In re LIBOR-Based Fin. Instruments Antitrust Litig*., No. 11 Civ. 5450

(NRB), 2016 WL 7625708, at *2 (S.D.N.Y. Dec. 21, 2016) (emphasis added). Since "[o]nly

Class members have standing to object to the Settlement of a class action," it necessarily follows

that "[o]bjectors who are non-Class members *lack standing* to object to the fairness,

reasonableness and adequacy of the Settlement." *In re Drexel Burnham Lambert Grp., Inc.*, 130

B.R. 910, 923 (S.D.N.Y. Aug. 27, 1991), *aff'd,* 960 F.2d 285 (2d Cir. 1992) (emphasis added);

*Cent. States Se. & Sw. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*,

504 F.3d 229, 244 (2d Cir. 2007) ("[n]onparties to a settlement generally do not have standing to

object to a settlement of a class action."). Under the Settlement, if S.A. is deceased, only

individuals that submit a death certificate for the Class Member and documents showing that

they have been appointed legal representatives of the Class Member's estate can file a claim on

behalf of the deceased Class Member, or otherwise act on behalf of the deceased Class Member.

Settlement Agreement ¶ 100. The correspondence from the unnamed individual does not establish that the individual purporting to act on behalf of the "estate" of S.A. is a duly-appointed legal representative of S.A., S.A.'s estate, or any Class Member; thus the unnamed individual does not have standing to object to the Settlement.

### 6.    Other *Grinnell* Adequacy Factors

The third *Grinnell* factor—the stage of the proceedings and the amount of discovery completed—favors approval of the Settlement. The relevant inquiry "is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *4. *In re Global Crossing Sec. and ERISA Litig.*, 225 F.R.D. 436, 458 (S.D.N.Y. 2004) ("Formal discovery is not a prerequisite; the question is whether the parties had adequate information about their claims."). As described *supra* (Part I.A), Plaintiffs obtained a voluminous amount of hard copy and electronic discovery from Defendant through contested motion practice, conducted numerous depositions, and sought information and documents from third parties. Plaintiffs used this information not only to assemble proof of Defendant's policies and practices, but also to understand the strengths and weaknesses of their liability and damages claims. As such, Plaintiffs possess adequate information about the merits of their claims to assess Defendant's position in settlement negotiations. *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *4; *Nichols*, 2022 WL 2705354, at *9 (discovery involved review of over one million pages of documents, complex data sets, numerous meet and confer sessions, court hearings and motion practice, and a dozen fact depositions, favored settlement). In addition, the thoroughness of the discovery performed here favors final approval. *See, e.g.*, *McMahon v. Olivier Cheng Catering and Events, LLC*, No. 08 Civ. 8713 (PGG), 2010 WL 2399328, at *5 (S.D.N.Y. Mar. 3, 2010) (finding that the parties' "efficient, informal exchange of information"

was enough discovery to recommend settlement approval). Courts often grant final approval of class settlements in cases where the parties conducted far less discovery than in this case. *See, e.g.*, *Matheson v. T-Bone Rest., LLC*, No. 09 Civ. 4214, 2011 WL 6268216, at *5 (S.D.N.Y. Dec. 13, 2011) (granting final approval where parties engaged in informal information exchange with no depositions because "Plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims" and "[t]he parties' participation in a day-long mediation allowed them to further explore the claims and defenses"). Here, where Class Counsel engaged in extensive discovery, this factor unquestionably favors final approval.

The seventh *Grinnell* factor—the ability of the defendants to withstand a greater judgment—does not preclude approval of the Settlement. Defendant, as a municipality, may be able to withstand a greater judgment. Nevertheless, courts have not found this factor to bar final approval of class actions settlements involving the City of New York. *See, e.g.*, *Parker v. City of New York*, No. 15 Civ. 6733 (CLP), 2018 WL 6338775, at *6 (E.D.N.Y. Dec. 4, 2018).

The eighth *Grinnell* factor—the range of reasonableness of the settlement in light of the best possible recovery—and the ninth *Grinnell* factor—the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation—both favor final approval. These factors are "often combined for the purposes of analysis." *In re Payment Card*, 330 F.R.D. at 48. "In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *Id.* at 48. The range of reasonableness for a settlement is "a range which recognizes the uncertainties of law and fact in any particular case and the concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores,* 396 F.3d at 119. Here, the settlement amount falls within the range of reasonableness in light of the best possible recovery. Many comparable

verdicts and settlements involving over-detention of individuals in criminal custody are lower

than the $3,500 figure was ultimately negotiated for each Instance of Release during the Class

Period. As awards for over-detention of individuals in criminal custody can range from a few

hundred dollars to many thousands of dollars, an award of $3,500 per instance is reasonable,

especially considering that courts frequently approve class settlements even where the benefits

represent "even a fraction of the potential recovery." *In re Initial Public Offering Sec. Litig.*, 671

F. Supp. 2d 467, 484 (S.D.N.Y. 2009) (approving settlement that provided only a "miniscule"

2% of defendants' maximum possible liability and observing that "the Second Circuit has held

that a settlement amount of even a fraction of the potential recovery does not render a proposed

settlement inadequate"); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402

(S.D.N.Y. 2009) (approving settlement that amounted to 5-12% recovery of provable damages);

*In re Crazy Eddie Sec. Litig.*, 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that

awarded class members between 6 and 10 cents for every dollar lost).

Further, the Settlement limits the liens and judgments that can be asserted against a Class

Member's Award Amount and offers valuable benefits counseling to Class Members on how an

award may affect their public benefits, if any—both these terms provide financial benefit to

Class Members that may not have been available to Class Members had they succeeded at trial.

Greenberger Decl. ¶¶ 61-62. Finally, there are significant risks of litigation—loss at the summary

judgment stage, loss of class certification, loss at trial, or loss on appeal—that would result in

Class Members receiving no recovery at all. *Id.* at ¶¶ 57-60. Therefore, as compared to the best

possible recovery and as compared to possible recovery in light of the risks of litigation, the

Settlement provides a more advantageous resolution to Class Members. *See Frank v. Eastman*

*Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005)  (determination of whether a settlement

amount is reasonable "does not involve the use of a mathematical equation yielding a particularized sum").

### 7.    Equitable Treatment of Class Members

After an adequacy assessment, Rule 23(e)(2)(d) finally requires the Court to consider whether "the proposal treats class members equitably relative to each other." Here, Class Members are treated equitably relative to each other in that they each receive the same amount—$3,500—for each Instance of Release from DOC custody during the Class Period.

The structure of the Settlement allows each Class Member to be eligible for a $3,500 settlement award if they can truthfully sign an attestation in their claim form confirming their time in DOC custody, their release on bail, and the delay in their release. While some Class Members may have been detained longer than others after their bails were paid, most Class Members do not possess the documentation necessary to show that they were released on bail from DOC custody during the Class Period; to show exactly when their bail was paid; or to show when exactly they were released from DOC custody. Greenberger Decl. ¶ 55. DOC, however, does appear to have reliable records showing whether an individual was in DOC custody during the Class Period and whether they were released on bail. *Id*. Based on the data analyzed by Class Counsel, nearly every Class Member was held for three or more hours after their bail was paid. It would be burdensome, inefficient, and unfair to require Class Members to submit (largely non-existent) documentation of their custody, release on bail, and delayed release. *Id*. Therefore, the Settlement solves these documentation concerns by awarding each Class Member a set amount for each instance of release during the Class Period, provided they sign the attestation and submit a valid claim form. And if a Class Member is entitled to claim an award for multiple instances of release during the Class Period, the structure of the Settlement Agreement ensures that they receive the same flat $3,500 payment for each instance of release. *Id.*

\*\*\*

Given the legal and factual disputes that persist, the Settlement represents a substantial recovery for class members. Application of Rule 23(e)(2) and the *Grinnell* factors weigh in favor of final approval.

## IV.   THE NEGOTIATED SERVICE PAYMENTS PROPOSED FOR THE NAMED PLAINTIFFS ARE FAIR AND REASONABLE

### A.   Courts Commonly Award Service Payments to Class Representatives Who Provide Substantial Assistance

The Second Circuit has recently confirmed that service awards for Rule 23 class representatives remain available and appropriate under circuit precedent. *See Hyland v. Navient Corp.*, 48 F.4th 110, 123 (2d Cir. 2022) (rejecting argument that service awards for litigation efforts are prohibited); *Fikes Wholesale, Inc. v. HSBC Bank USA, N.A.*, 62 F.4th 704, 721 (2d Cir. 2023) (recognizing that *Hyland* is binding precedent).  In this Circuit, the Courts have, "with some frequency," allowed for class representatives to "apply for and, in the discretion of the Court, receive an additional award, termed an incentive award."  *Roberts v. Texaco, Inc.*, 979 F. Supp. 185, 200 (S.D.N.Y. 1997).  That is particularly true here, where the City is paying service awards in addition to the Award Amount; no Class Member's recovery is reduced by the service awards.

District courts generally rely on the following factors in considering whether to grant a service award:

> [1] the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, [2] the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), [3] any other burdens sustained by that plaintiff ... and, of course, [4] the ultimate recovery.

*Fikes Wholesale, Inc.*, 62 F.4th at 721. Moreover, the "risk" factor is particularly important in considering the propriety of incentive awards in civil rights litigation. Indeed, as Judge Brieant aptly recognized in the context of employment discrimination cases, civil rights plaintiffs are particularly deserving of incentive awards because there is "a fundamental distinction" between these cases where plaintiffs "may be at risk by reason of having prosecuted the suit" and "securities-based litigation" where those risks are absent. *Roberts*, 979 F. Supp. at 201. The same can be said of "civil rights [c]ases where plaintiffs justifiably fear retribution or are in danger because of their willingness to step forward." *In re Am. Bus. Fin. Servs. Inc. Noteholders Litig.*, 2008 WL 4974782, at *19 (E.D. Pa. Nov. 21, 2008).

Here, the two Named Plaintiffs, Lloyd Jones and Baron Spencer, have challenged as unconstitutional the policies and practices of the City of New York, and in particular, the practices of DOC—which operates the largest municipal jail system incarcerating tens of thousands of people each year. *See generally* ECF No. 1. More importantly, Plaintiffs Jones and Spencer themselves have been incarcerated by DOC. By filing a public, federal lawsuit against the City, Plaintiffs Jones and Spencer revealed that they had been arrested, incarcerated, and released on bail. The arrest of Plaintiff Spencer that is described in the Complaint was ultimately sealed. Greenberger Decl. ¶ 66; N.Y. C.P.L. § 160.50 (sealing of criminal proceedings that terminated in favor of the accused). Plaintiffs Jones and Spencer faced a fear of retaliation by the City and its agencies due to the grave allegations they made on behalf of themselves and thousands of other people, which carried the potential of significant financial liability for the City. In addition, Plaintiffs Jones and Spencer risked adverse consequences to their employment, housing, and relationships from publicly revealing their involvement in the criminal justice

system. Thus, the risk assumed by Plaintiffs Jones and Spencer in coming forward and prosecuting this case was considerable.

In addition, Plaintiffs Jones and Spencer have devoted significant time and effort in litigating this matter to its conclusion. They provided Class Counsel with detailed factual information regarding their experiences in DOC custody, including intake, bail, and release practices. Greenberger Decl. ¶ 66. Plaintiff Jones sat for a hearing conducted by the City pursuant to Municipal Law 50-h. *Id.* They approved the Settlement and made themselves readily available to communicate with Class Counsel during the settlement conference. Plaintiffs Jones and Spencer were also prepared to be deposed by the City, in which they likely would have been questioned about their personal history and involvement in the criminal justice system.

Moreover, they also chose not to pursue settlement of their individual claims against the City for the nearly six years since this lawsuit was filed. By doing so, Plaintiffs Jones and Spencer deferred a quicker monetary resolution for themselves in order to continue their service as Named Plaintiffs and ensure that the entire class of individuals affected by the City's unlawful bail practices could receive monetary redress. *Id.*

In sum, Named Plaintiffs Jones and Spencer spent six years committed to this case, at personal risk, to bring resolution to a class of over 70,000 absent class members. Service payments are appropriate and would to "serve the salutary purpose of encouraging 'private attorney[s] general' to further policies that seek to bar unlawful [] practices and policies." *Roberts*, 979 F. Supp. at 201 n.25; *Droegemueller v. Petroleum Dev. Corp.*, 2009 WL 961539, at *5 (Dist. Ct. Colo. Apr 7, 2009) ("The purpose of incentive awards for class representatives is to encourage people with significant claims to pursue actions on behalf of others similarly situated.").

**B.** **The Amount of the Proposed Service Awards in this Case is Appropriate in Light of the Class Recovery and Similar Service Awards Approved in this Circuit.**

In this case, the Claimant Total is $141,256,500. Janowicz Decl. ¶ 47(a). The total

amount of the proposed service awards ($20,000 each for Lloyd Jones and Baron Spencer, or

$40,000) is 0.02% of the Claimant Total being paid to the Class Members who have submitted

timely valid claims. *See Peterson v. Alaska Commc'ns Sys. Grp., Inc.*, No. 3:12 Civ. 00090

(TMB)(MMS), 2022 WL 788399, at *9 (Dist. Ct. Alaska Mar. 15, 2022) (finding incentive

awards of $15,000 and $30,000 to named plaintiffs as reasonable in part because they represent

only two percent of the total settlement). Thus, given the attendant risks and the nearly six (6)

years of dedicated service to the class in this case, the proposed awards should be approved.

Awards of this amount – or greater – have been frequently approved in this Circuit. *See

e.g.*, *Roberts*, 979 F. Supp. at 185 (awarding $50,000 and $85,000 to two of the named plaintiffs

in a racial discrimination employment class action); *Wright v. Stern*, 553 F. Supp. 2d 337, 345

(S.D.N.Y. 2008) (approving $50,000 awards to each of 11 named plaintiffs in employment

discrimination action); *Roberts.*, 979 F. Supp.at 203-04  (awarding named plaintiffs who had

initiated class action incentive awards of $85,000 and $50,000); *Ingram v. The Coca-Cola Co.*,

200 F.R.D. 685, 694 (N.D. Ga. 2001) (four representative plaintiffs awarded $300,000 each);

*Brotherton v. Cleveland*, 141 F. Supp. 2d 907, 913-14 (S.D. Ohio 2001) (approving incentive

awards ranging of $50,000); *Van Vranken v. Atl. Richfield Co.*, 901 F. Supp. 294, 299-300 (N.D.

Cal. 1995) ($50,000 incentive award); *Enter. Energy Corp. v. Columbia Gas Transmission

Corp.*, 137 F.R.D. 240, 250 (S.D. Ohio 1991) (six class representatives granted incentive awards

of $50,000 each); *Liberte Capital Grp. v. Capwill*, No. 5:99 Civ. 818, 2007 WL 2492461, at *3

(N.D. Ohio Aug. 29, 2007) ($97,133.83 to class plaintiff). Indeed, incentive awards in the

amounts of $25,000 and $35,000 "fall solidly in the middle of the range." *McBean*, 233 F.R.D. at

391 (approving payments of $25,000 incentive awards to each named plaintiff). Accordingly, the proposed service awards in the amount of $20,000 for the two Named Plaintiffs Jones and Spencer are reasonable and should be approved given their commitment and service to the class and this lawsuit, as detailed above. *See supra* Part IV.A.

## V.   FINAL CERTIFICATION OF THE RULE 23 SETTLEMENT CLASS IS APPROPRIATE

This Court preliminarily certified a Settlement Class in its preliminary approval order. ECF No. 179 at ¶¶ 3-4. The Settlement Class meets all of the legal requirements for class certification for settlement purposes under Fed. R. Civ. P. 23(a) and 23(b)(3) for the reasons set forth in Plaintiffs' Memorandum of Law in support of Motion for Preliminary Approval. *See* Pl.'s Memo. of Law in support of Mot. for Preliminary Approval at 32-36, ECF No.174. For the reasons set out in that brief, and found by the Court in its Preliminary Approval Order, the Settlement Class should be finally certified for settlement purposes. *Hezi v. Celsius Holdings, Inc.*, No. 1:21 Civ. 09892 (JHR), 2023 WL 2786820, at *2 (S.D.N.Y. Apr. 5, 2023).

## CONCLUSION

Plaintiffs respectfully request the Court grant Plaintiffs' motion for final approval of the Settlement, with a determination on Class Counsel's fees and costs to be determined at a later date.  Plaintiffs ask the Court to enter the proposed final approval order attached to the Greenberger Declaration as Exhibit 2, which the City has approved.

Dated: June 26, 2023
      New York, New York

                            EMERY CELLI BRINCKERHOFF
                            ABADY WARD & MAAZEL LLP

                            By:          /s/
                            Matthew D. Brinckerhoff
                            Julia P. Kuan
                            Debra L. Greenberger
                            Vasudha Talla
                            600 Fifth Avenue, 10th Floor
                            New York, New York 10020
                            212-763-5000

                            KAUFMAN LIEB LEBOWITZ & FRICK
                            David Lebowitz
                            10 E. 40th Street, Suite 3307
                            New York, NY 10016
                            (212) 660-2332

46

**CERTIFICATION OF COMPLIANCE**

Pursuant to Section III.D. of the Individual Practices of Judge John G. Koeltl, undersigned counsel hereby certifies that the above Memorandum of Law in Support of Plaintiffs' Motion for Preliminary Approval of Settlement has 14,364 words, exclusive of the cover page, certification of compliance, table of contents, and table of authorities. The Court granted Plaintiffs' letter motion to file a memorandum of law not exceeding 14,500 words. ECF No. 194. This brief complies with the formatting rules of Section III.D of Judge Koeltl's Individual Practices.

Dated: June 26, 2023
       New York, New York

By: _____/s/_____
       Debra L. Greenberger