```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
```
―――――――――――――――――――――――――――――

LLOYD JONES, ET AL.,

                Plaintiffs,        17-cv-7577 (JGK)

      - against -                 **MEMORANDUM OPINION AND ORDER**

CITY OF NEW YORK,

                Defendant.

―――――――――――――――――――――――――――――

**JOHN G. KOELTL, District Judge:**

    Jason Gormick, Carlos Pizarro, Curtis Favor, and Macye McCall (together, the "movants") move to compel the inclusion of their late claims in the class action settlement in Jones v. City of New York. The defendant, the City of New York, opposes the motion. In the underlying action, the plaintiffs, on behalf of themselves and a putative class, asserted claims against the City, alleging that the City unconstitutionally detained them after their bail was paid. The movants are verified members of the Jones plaintiff class. For the following reasons, the motion to compel inclusion of the movants' late claims is **granted**.

I.

    The following facts, taken from the movants' and the City's declarations and exhibits, are undisputed.

    In 2017, a class of current and former detainees under the custody of the City (individually, a "Class Member"; collectively, the "Class") sued the City pursuant to 42 U.S.C.

1

§ 1983, alleging, among other things, that the City unconstitutionally restrained their liberty by detaining them for an excessively long period of time after they had posted bail. ECF No. 251 ("Aroubas Decl.") ¶ 2.

On October 21, 2022, after lengthy negotiations, the Class and the City entered into a settlement agreement. Id. ¶ 3; see also ECF No. 175-1 ("Settlement Agreement"). Under the Settlement Agreement, each Class Member who filed a claim would receive $3,500 for each instance of delayed bail release covered by the settlement. Aroubas Decl. ¶ 6. The number of instances of delayed release in the Class Period was calculated to be 94,190,[1] see id. ¶ 33, which meant that the City's maximum total potential obligation under the Settlement Agreement amounted to $329,665,000.[2]

The Settlement Agreement provided for two deadlines for the submission of claims. The first deadline was the "Bar Date":

> **"Bar Date"** is the date established by the Court by which any presumptive Class Member who wishes to receive payment pursuant to this Agreement must submit a Claim Form online or [by] mail and postmark the Claim Form . . . . The Parties agree that this date should be at least 35 days before the Final Approval Hearing.

---

[1] The Class Period is October 4, 2014, through October 21, 2022. Settlement Agreement ¶ 22.
[2] $3,500 multiplied by the total number of qualifying instances of release equals $329,665,000. See Settlement Agreement ¶ 11.

2

Id. ¶ 6.³ The second deadline was for late claims (the "Late Claim Deadline"):

> The [settlement administrator (the "Administrator")] shall accept untimely claims that are received by the Administrator within three (3) months of the Effective Date of Payment if a Class Member can establish good cause for submitting an untimely claim form.

Id. In turn, the Settlement Agreement provided that the Effective Date of Payment—the day on which the City was required to deposit with the Administrator the total amount to be paid to Class Members who made valid claims—was "the date no later than 21 business days after the Final Approval Order is final." Id.

As detailed below, the Bar Date was ultimately set at June 6, 2023, and the Late Claim Deadline at December 12, 2023.

On November 22, 2022, the plaintiffs submitted the Settlement Agreement, along with a proposed notice program (the "Notice Program"), to this Court for preliminary approval, which this Court granted on December 1, 2022. See id. ¶¶ 8-12. The Bar Date was set at June 6, 2023. Id. ¶¶ 7, 16. Thereafter, the Court held a hearing and granted final approval of the settlement finding that "the proposed Settlement resulted from serious, informed, non-collusive negotiations." Id. ¶ 28. Accordingly, the Court ordered the final approval of the Settlement Agreement on July 11, 2023, and entered judgment the

---

³ Unless otherwise noted, this Memorandum Opinion and Order omits all internal alterations, citations, footnotes, and quotation marks in quoted text.

3

next day. Id. ¶¶ 30—31. The Late Claim Deadline was set at December 12, 2023. Id. ¶¶ 7, 30. This Court retained jurisdiction over the implementation of the Settlement Agreement. ECF No. 208 ¶ 19.

The Notice Program approved on December 1, 2022, was "designed to reach the greatest practicable number of Class Members," Aroubas Decl. ¶ 9, and provided for a two-step notification process by physical mail and email, defining those forms of notice as follows:

> **Notice by Mail:** Individual notice comprised of cover letter, summary notice, claim form, and prepaid return envelope, to be sent to all identifiable class members using the last known address . . . .
>
> **Notice by Email:** Supplemental individual notice to all class members that [sic] email address is available or located through a search process . . . .

Id. ¶ 11. The Notice Program also provided for general advertisements over broadcast, print, outdoor, digital, and social media. See id.

The Notice Program was implemented to substantial effect. On January 26, 2023, mailed notices were sent to the last known addresses of 72,377 identifiable potential Class Members, although 15,161 notices remained undelivered by June 4, 2023—two days before the Bar Date. Id. ¶ 19. Also on January 26, 2023, emailed notices were sent to 66,812 Class Members, with 7,217 email notices remaining undelivered. Id. Ultimately, 79% of the

4

mailed notices and 89.2% of the emailed notices were delivered. Id. As of June 23, 2023, the total payment for all validated claims to date was $141,256,500—over 40% of the City's maximum potential obligation under the Settlement Agreement. Id. ¶ 24; Settlement Agreement ¶ 11.

However, each of the four movants on this motion either never received mailed or emailed notice of the Settlement Agreement or did not receive notice in time to submit a claim by the Late Claim Deadline.

Jason Gormick, who suffers from dementia, experiences limitations with his memory, executive functioning, and motor skills, and has difficulty accessing the internet, never resided at the address to which his mailed notice was originally sent and does not recall receiving emailed notice. ECF No. 244, Gormick Decl. ¶¶ 5, 8, 12-14. On September 15, 2023, Gormick learned about the Settlement Agreement from a friend; he called the Administrator that day and gave the Administrator his actual address to which a claim packet could be mailed. Id. ¶ 6. On October 26, 2023, Gormick still had not received a claim packet. He called the Administrator and learned that, while a claim packet had been mailed to his address, his apartment number had been omitted. Id. ¶ 7. Gormick again provided the Administrator with his full, correct address, but still no claim packet arrived. Id. Gormick called the Administrator—for the third

5

time—on December 18, 2023, and learned that he had missed the Late Claim Deadline. Id. ¶ 15.

Carlos Pizarro suffers from a serious mental health disability and lives in supportive housing, where he has a case manager who assists him with sending mail and completing documents. ECF No. 245, Pizarro Decl. ¶¶ 9-10. Pizarro's mailed notice was sent to a shelter at which he had not resided for three years, and his original emailed notice was sent to an email address that he does not recognize. Id. ¶¶ 4-5, 8. On December 5, 2023, Pizarro did receive an email providing notice of the Settlement Agreement; however, it was addressed to a different name and the claim forms included requested personal information, leading Pizarro to worry that the email might be a scam. Id. ¶ 6. Six days later, on December 11, 2023, Pizarro called the Administrator, who verified for Pizarro that the email was not a scam and gave him a claimant identification number. Id. ¶ 7.

But the claim form that Pizarro then attempted to complete required his social security number, which he did not recall. Id. ¶ 11. The next day, on December 12, 2023, Pizarro went to a Social Security Administration office to request a new social social security card, which took approximately ten days to arrive. Id. ¶ 12. With his case manager's assistance, Pizarro was able to mail his claim form to the Administrator in early

6

January 2024, but when he called the Administrator on January 10, 2024, to confirm receipt, he learned that he had missed the Late Claim Deadline. Id. ¶¶ 13-15.

Curtis Favor did not have a stable address from June 2022 to November 2023. ECF No. 246, Favor Decl. ¶ 5. Therefore, while he resided at the address to which his mailed notice was sent before June 2022 and began living there again in November 2023, id. ¶ 4, he did not receive his mailed notice because the notices were mailed on January 26, 2023, see id. ¶ 7. Favor also did not receive emailed notice of the Settlement Agreement. Id. ¶ 8. During the week of December 4, 2023, a friend told Favor about the Settlement Agreement. Id. ¶ 9. Favor obtained the Administrator's phone number from that friend and called the number, but he heard only a pre-recorded message and left a voicemail; his call was not returned. Id. ¶¶ 9-10. Due to work and family obligations, Favor was unable to call again until December 13, 2023. Id. ¶ 10. This time, the Administrator picked up the phone and informed Favor that he had missed the Late Claim Deadline by one day. Id. ¶ 11.

Macye McCall's mailed notice was sent to the address of an ex-girlfriend. ECF No. 247, McCall Decl. ¶ 8. McCall did not receive it because he has been incarcerated since July 9, 2020, see id. ¶ 5, before mailed notices were sent on January 26, 2023, and because his ex-girlfriend never informed him about

7

mail received at her address, id. ¶ 8. Nor did he receive his emailed notice—he is unable to access email at the correctional facility where he has been detained since January 2023—and, in any event, does not recognize the email to which his emailed notice was sent. See id. ¶ 9. McCall only learned of the Settlement Agreement in January 2024 from a fellow inmate. Id. ¶ 7. When he called the Administrator, the Administrator informed McCall that he had missed the Late Claim Deadline. See id. ¶ 8.

## II.

The movants argue that the Court should exercise its equitable power to compel the inclusion of their late claims. The City responds that the Court should decline to consider the equities and instead strictly enforce the terms of the Settlement Agreement or, in the alternative, find that the equities favor denying the motion.

As the Second Circuit Court of Appeals recognized over fifty years ago, a court overseeing a class action settlement has the "inherent power and duty to protect unnamed, but interested persons." Zients v. LaMorte, 459 F.2d 628, 630 (2d Cir. 1972). This inherent equitable power allows a court to "accept late claims despite the contrary terms of an agreement among the parties." In re Oxford Health Plans, Inc., 383 F. App'x 43, 45 (2d Cir. 2010). "[A] district court entertaining a

8

late-submitted claim to a settlement should examine the equities to determine whether to allow the claim." Id. In balancing the equities, a court determines whether the delay resulted from "excusable neglect" by considering factors that include: (1) "the danger of prejudice," (2) "the length of the delay and its potential impact on judicial proceedings," (3) "the reason for the delay, including whether it was within the reasonable control of the movant," and (4) "whether the movant acted in good faith." Id. (quoting Pioneer Inv. Servs. v. Brunswick Assocs. Ltd. P'ship, 507 U.S. 380, 395 (1993)).

**A.**

As a threshold matter, the City appears to suggest that the Court cannot—and in any event clearly argues that the Court should not—consider the equities, because the Settlement Agreement's deadlines were the product of vigorous negotiation between the parties and those deadlines bar the movants' claims. The movants do not dispute that their claims were late; instead, the movants contend that the Court can and should consider the equities of accepting their late claims.

The City's argument is unavailing. As outlined above, where, as in this case, a district court has retained jurisdiction over the implementation of a settlement agreement, the court plainly has the power to accept late claims "despite the contrary terms of an agreement among the parties." Id.; see

9

also Zients, 459 F.2d at 630 (concluding that, even where late claims were ostensibly barred under the terms of a carefully negotiated agreement, "[u]ntil the fund created by the settlement is actually distributed, the court retains its traditional equity powers").

In support of its position, the City points to cases in which courts in this District have concluded that balancing the equities in deciding whether to accept late claims is inappropriate when the deadlines at issue were the product of vigorous bargaining between the parties. See Dahingo v. Royal Caribbean Cruises, 312 F. Supp. 2d 440, 447 (S.D.N.Y. 2004) (stating that courts should consider Pioneer's equitable factors only when "the terms at issue had not been bargained for or . . . the dispute did not implicate the ultimate obligations of the defendant"); Flynn v. N.Y. Dolls Gentlemen's Club, No. 13-cv-6530, 2015 WL 2359830, at *2 (S.D.N.Y. Apr. 28, 2015) (relying principally on Dahingo in finding "no basis to go beyond simple contract principles").

However, the City's reliance on Dahingo and Flynn is misplaced. First, the Dahingo court—in 2004—reasoned that "Pioneer is of little relevance here, since it concerned the construction of a term contained in the Federal Rules of Bankruptcy, not principles for implementing settlement agreements." 312 F. Supp. 2d at 447. But in 2010, the Second

10

Circuit Court of Appeals explained that it was, in fact, proper for a district court entertaining a late claim against a settlement fund to look to the Pioneer factors in balancing the equities. In re Oxford, 383 F. App'x at 45. As the Oxford court observed, Pioneer arose in the "analogous context of determining whether a party has shown excusable neglect of a deadline under an applicable federal rule." Id. In both contexts, "district courts make a similar 'equitable' determination, 'taking account of all relevant circumstances surrounding the party's failure to act in a timely manner.'" Id. (quoting Pioneer, 507 U.S. at 395).

Second, it is incorrect that courts can examine the equities in considering whether to permit late claims only when the terms at issue have not been bargained for. Zients, a 1972 decision from the Second Circuit Court of Appeals, is instructive. In that case, the parties to a consolidated securities class action, "[a]fter lengthy negotiations, executed a Stipulation . . . and Settlement." 459 F.2d at 629. That settlement included a functional deadline, which provided that claimants' "[Proof of Claim] forms must be returned within 45 days of the mailing [of the forms]." Id. The district court in that case determined that it lacked the discretion to accept the claims of five claimants who submitted late claims. See id. at 630. The Court of Appeals reversed, explaining that the district

11

court "retain[ed] its traditional equity powers" to administer the settlement. Id.

Accordingly, it is appropriate to apply the Pioneer factors to decide whether equitable considerations favor the inclusion of the movants' late claims.

**B.**

Applying the Pioneer factors for excusable neglect, the movants have established that the equities favor the inclusion of their claims.

There are five late claims at issue on this motion. McCall has two late claims based on two incidents of late release following posting bail, and each of the other three movants has one claim.

In arguing that the Pioneer factors weigh against finding excusable neglect, the City focuses principally on the first factor: the danger of prejudice. The City contends that it would be unduly prejudiced by the inclusion of the movants' late claims because inclusion would increase the City's monetary obligation under the Settlement Agreement.

However, as the movants correctly point out, any such prejudice would be minimal. The addition of the movants' five late claims would increase the City's obligation by only $17,500—$3,500 for each claim—reflecting just 0.005% of $325,665,000, the City's maximum potential obligation if all

12

94,190 claims contemplated by the settlement had been made, and .01% of the $141,256,500 that the City had already paid out to claimants (as of June 23, 2023). See In re Crazy Eddie Sec. Litig., 906 F. Supp. 840, 844, 846 (E.D.N.Y. 1995) (finding any prejudice to the defendants "negligible" where late claims represented "1.4% of the maximum settlement amount that the defendants agreed to pay"); Grottano v. City of New York, No. 15-cv-9242, 2021 WL 6427554, at *1 (S.D.N.Y. Dec. 17, 2021) (finding "little to no risk of prejudice" in adding ten late claimants because the claimants represented only a "minuscule fraction"—0.08%—of the settlement class). Moreover, although the City submits that its monetary obligation will also increase by the amount it would cost for the Administrator to process the late claims, the City fails to quantify these additional administrative costs. In any event, there is no showing that the administrative costs of processing just five late claims would prejudice the City in any significant way.

More justifiable is the City's concern that accepting the movants' claims will open the floodgates to many more late claims. This concern, if borne out, could result in a more than negligible increase in the City's monetary obligation—after the City has already carefully negotiated for and relied upon a series of deadlines. But no other claims submitted after the Late Claim Deadline have been brought to the Court's attention.

13

Each of the four movants on this motion attempted to participate in the settlement within about a month of the Late Claim Deadline. If any new claimants sought to participate in the settlement, their claims—not yet made—would be made more than nine months after the Late Claim Deadline, and their claims to participate in the settlement would be demonstrably weaker. As more time passes, the equities will weigh increasingly against the acceptance of additional late claims. See Ivani Contracting Corp. v. City of New York, 103 F.3d 257, 259 (2d Cir. 1997) ("[E]quity aids the vigilant, not those who sleep on their rights.").

The remaining Pioneer factors weigh in the movants' favor, and the City does not suggest otherwise.

With respect to the length of the delay and its potential impact on judicial proceedings, there is no indication that the inclusion of the movants' claims would hamper the disbursement of the settlement funds to other Class Members. See Grottano, 2021 WL 6427554, at *2 (finding it "inconceivable" that the addition of ten late claims would delay payment to the thousands of members of the settlement class). As of December 12, 2023, the Administrator had issued two rounds of settlement payments to Class Members, anticipated issuing a third round of payments later that month, and was still processing a fourth round of payments. ECF No. 229 ¶ 2. Accepting the movants' claims would

14

therefore extend the claims processing period by only several months.

Next, the delay was not within the reasonable control of the movants, and the movants acted in good faith. It is undisputed that three of the movants—Gormick, Favor, and McCall— never received actual mailed or emailed notice, and that Pizarro received notice too late to file a claim before the Late Claim Deadline, despite his reasonable efforts. Although courts typically give this Pioneer factor a "hard look," In re Oxford, 383 F. App'x at 45, lack of actual notice generally constitutes a reason for delay beyond a movant's reasonable control. See Grottano, 2021 WL 6427554, at *2 (finding that this Pioneer factor favored several claimants who did not receive mailed notice until after the deadline had passed because they relocated during the COVID-19 pandemic); In re Nassau Cnty. Strip Search Cases, No. 99-cv-2844, 2018 WL 1505563, at *2-3 (E.D.N.Y. Mar. 27, 2018) (concluding that this factor favored late claimants whose notices were mailed to incorrect addresses or returned to sender). Moreover, it is plain that the movants acted in good faith: Each movant attempted to file claims promptly upon learning about the settlement, with all movants missing the Late Claim Deadline by a short period of time.

15

In sum, all four of the Pioneer factors weigh in favor of the movants. Accordingly, the movants' motion to compel inclusion of their late claims is **granted**.

## CONCLUSION

The Court has considered all of the arguments raised by the parties. To the extent not specifically addressed above, the arguments are either moot or without merit. For the foregoing reasons, the motion to compel inclusion of the late claims by the movants is **granted**. The Clerk is directed to close ECF No. 241.

**SO ORDERED.**

Dated:   New York, New York
         September 26, 2024

                                       _____
                                            John G. Koeltl
                                       United States District Judge